**Wayne JOHNSON, Appellant,**
v.
**UNITED STATES of America,**
**Appellee.**
No. 16371.

United States Court of Appeals Ninth Circuit.
June 24, 1959.

John C. Wesley, Phoenix, Ariz., for appellant.

Jack D. H. Hays, U. S. Atty., William A. Y. Holohan, Asst. U. S. Atty., Phoenix, Ariz., for appellee.

Before POPE, STEPHENS and HAMLIN, Circuit Judges.

POPE, Circuit Judge.

Appellant is an Indian who formerly lived on the Gila River Indian Reservation in Arizona where the events here described occurred. According to his own testimony, he was driving in his car, accompanied by four juveniles, also Indians, on July 5, 1956. Appellant was then 27 years of age; two of his companions were 17, and two were 15. The boys wanted to return to a tavern where they had been before, so they could attack another Indian, one Antone, with whom one of them had had an altercation. Appellant drove them back; Antone was taken into the car, then appellant drove them out into the desert. Antone was taken out, beaten and left lying as the others drove off. Later, appellant and his companions drove back where Antone had been left. Antone was beaten and attacked again. (In the process Antone had been stripped, a cross carved on his back, and his sex organs cut off.) Appellant and his boy companions then left Antone to die.

When appellant and the two older boys were indicted for murder appellant employed an attorney chosen by him through his mother to handle his defense. He pleaded not guilty. The lawyer interviewed him frequently. He also interviewed the attorneys for the other defendants. He learned that appellant had given a lengthy signed statement to an F.B.I. agent. The statement was shown to the attorney. It was very damaging.[1] In it appellant said that the first time Antone was attacked, he was kicked, cut and beaten, one of them "stomping" on his head and in his face. They then got in the car, and drove about for a time, and then "we all decided to return to where we left Antone and finish him off." All, including appellant, started beating and kicking Antone. Antone "passed out". He said "I do not remember if I stabbed Antone with my knife, nor do I remember if I cut off any of his sex organs." The lawyer also saw a statement taken from Leroy Lewis, one of the 17 year old boys. He described appellant as the leader and the one who suggested the beating.[2]

Confronted with the knowledge that his client was a participant in the events of a peculiarly cold-blooded and revolting murder, with all indications that the other witnesses would put primary blame on the 27 year old appellant, with all the circumstances such that a jury might well believe the older man the prime mover and ring leader, the attorney had his client plead guilty to second degree murder. He was sentenced to life imprisonment.

After having thus escaped what might reasonably have been anticipated,—a verdict of first degree murder and the death penalty,—appellant, on reaching Leavenworth prison, in collaboration with some other inmate, not named, proceeded to turn on his lawyer by filing a petition for vacation of his sentence under Title 28, § 2255, alleging that "his legal counsel was inadequate and ineffective, which simply means that defendant should have been considered to have had no counsel at all." He alleged his counsel told him that if he would plead guilty he would receive ten years; if he pleaded not guilty, he would receive the death sentence. He asserted denial of his constitutional right to have assistance of counsel.[3]

While it is questionable whether these allegations stated facts sufficient to show any denial of Constitutional right, see Taylor v. United States, 9 Cir., 238 F.2d 409, 413–414, and cases there cited,[4] yet the trial court followed the sound procedure of holding a hearing and taking

1. "We all got out of the car and proceeded to beat Antone, kicking him and hitting him with our fists. While Antone was on the ground, we pulled his clothes off and I remember taking my pocket knife and cutting Antone's pants into."

2. "Wayne Johnson (appellant) said he was going back and cut Willard Dean Antone's sex organs off."

3. A further allegation was that on a date which was some five months subsequent to the imposition of the sentence, the attorney had made a sworn statement that "he did not believe the defendant * * * was guilty of murder * * * such action by said defense counsel was disgraceful and unethical, as well as depriving defendant of his Constitutional rights."

The record shows that after the guilty plea, the attorney, in an effort to minimize the sentence, arranged to have a doctor administer a "truth serum" and then interview the appellant. His attempt was to establish that this appellant had not, during the beating of Antone, done the actual cutting. Later the attorney made a sworn statement to the effect that he was convinced by the truth serum tests that appellant had not done those particular acts. He gave this statement to appellant to aid him in seeking clemency. While that statement may establish some degree of credulity in the attorney, it actually shows nothing except a continued effort on the part of the attorney to aid his client.

4. "Nor will allegations of incompetence or inefficiency on the part of his counsel ordinarily suffice, unless counsel's purported representation 'was such as to make the trial a farce and a mockery of justice.'"

evidence. Counsel was appointed to represent appellant who was brought from Leavenworth prison to testify.

The court made findings setting forth in some detail the preparation made by the attorney for defense of the appellant, the decision to plead guilty, and that before accepting the plea the court "advised the defendant that he could be sentenced to life imprisonment, and after the defendant indicated that he understood the consequences of his plea, the court accepted his plea of guilty to murder in the second degree." The court concluded as follows: "II—The defendant Wayne Johnson was represented by competent counsel during the course of the case. III. Counsel for the defendant Wayne Johnson acted properly and faithfully in his representation of the defendant in this matter. IV—The plea of guilty by the defendant Wayne Johnson to murder in the second degree was voluntarily made by the defendant. V. The plea of guilty by the defendant Wayne Johnson to murder in the second degree was made by the defendant with full understanding of the meaning of the charge and the consequences of his plea of guilty."

In short, the court disbelieved the appellant's testimony. Appellant's effort, by this appeal to assert that these findings are erroneous, is utterly frivolous. Appellant's testimony was inherently incredible. He admitted he had told the attorney he participated in abducting the victim, but now tried to testify he had done no such thing. Obviously he drove the car. He returned the second time to the murder scene, when Antone was finished off. While he was undertaking to prove that the attorney improperly advised him, yet he would not allow his present attorney to ask the lawyer under attack whether appellant had admitted to him that he had participated in the attack;—he asserted his privilege, so his counsel below had to withdraw the question.

It is plain that this case does not merit the extensive discussion it has received here. A brief order reciting that the judgment must be affirmed because the court simply found the facts against appellant, on overwhelming evidence against him, should suffice. We have taken pains here to set forth the facts more fully because we think it appropriate, by so doing, to demonstrate how the provisions of Title 28 § 2255 can be abused, and judicial processes perverted by the irresponsible use of a well-oiled typewriter and an uninhibited willingness to improvise a story.

A busy trial court was required to put off pressing cases properly before it to grant a hearing on a petition fabricated by appellant with the aid of some Leavenworth cell-mates. Appellant had to be transferred, under guard, from Leavenworth to Phoenix and return. An outrageously frivolous appeal such as this, obviously taken in bad faith, should not be allowed to take up the time of a court like this one, swamped with pressing business.

Cases similar to this are currently flooding the courts by the hundreds. This is not an isolated instance of the abuse of § 2255, although candor compels us to say we cannot recall one quite so outrageous as this one. A day to day observation of these cases, as currently proliferated in sundry penitentiaries,[5] suggests the need to build into § 2255 some safeguards to protect the courts against the abuse of their processes which persons like this appellant are now enabled to perpetrate.

The order is affirmed.

---

5. Writing of a somewhat comparable situation with respect to State prisoners, Mr. Justice Schaefer of the Supreme Court of Illinois said: "Four hundred of the total 4,400 inmates (at Joliet) own typewriters. More than 3,000 legal documents a year come from that institution." Federalism and Criminal Procedure, 70 Harv.L.Rev. 1, 22.