UNITED STATES of America,
Plaintiff,

v.

James BOSTIC, Defendant.

Crim. No. 58600.

United States District Court
District of Columbia.

March 30, 1961.

Edward J. Skeens and Ernest C. Raskauskas, Washington, D. C., for defendant, for the motion.

Oliver Gasch, U. S. Atty., and Luke Moore, Asst. U. S. Atty., for United States.

HOLTZOFF, District Judge.

The defendant James Bostic was convicted in this court on February 9, 1937, after a trial before Judge James Proctor and a jury, of murder in the first degree and was sentenced to death by electrocution. The sentence was later commuted by the President to imprisonment for 99 years. The defendant is now serving this sentence in the Atlanta Penitentiary.

■ .At this time, twenty-four years after his conviction, the defendant moves pursuant to 28 U.S.C. § 2255, to vacate the judgment, on the alleged ground that he was mentally incompetent to stand trial. The very idea that a court should be requested to determine whether at the time of his trial, over twenty-four years ago, the defendant understood the nature of the proceedings against him, and was able to consult with counsel—for that is what mental competency to stand trial means—seems preposterous and borders on the fantastic. Obviously, it is well nigh impossible to determine the extent of a person's mental understanding on a particular day over twenty-four years ago. It verges on the bizarre and the absurd when the additional facts are, as is true here, that defendant was represented by counsel who never complained that his client was unable to consult with him or assist him, and that the defendant took the witness stand at his trial and rationally testified in his own behalf at considerable length.

■ Unlike most motions under 28 U.S.C. § 2255, which are generally mailed to the court by the prisoner *in propria persona*, this motion was prepared and is being submitted by a member of the District of Columbia bar, who, however, had not represented the defendant previously. As the trial judge is deceased, the motion was referred to me under Rule 25 of the Federal Rules of Criminal Procedure, 18 U.S.C., since I was presiding in Criminal Court No. 1. This court has reviewed the voluminous files and records of the case, as well as a transcript of the proceedings at the trial, and has also heard oral argument on the preliminary question whether the defendant is entitled to a hearing on the merits of his application.

The history of this case is somewhat unusual and proper disposition of the present motion makes it desirable to review chronologically what has previously occurred. The fact that the defendant killed the victim named in the indictment is not disputed. Consequently, we are not confronted with a case of a person who is clamoring that he is innocent of the crime of which he was convicted. If this were the case, no lapse of time should deprive the innocent party of his rights. The issues that were litigated at the trial were the degree of homicide and a claim of self-defense.

On October 9, 1936, in an altercation originating out of a petty, inconsequential quarrel, the defendant fatally shot one William Tuckson, Jr. This is not denied or disputed. On November 12, 1936, the defendant was indicted for murder in the first degree. He was tried before Judge Proctor and a jury on February 8 and 9, 1937, and was found guilty. On March 19, 1937, he was sentenced to death by electrocution. The conviction was unanimously affirmed by the Court of Appeals on December 20, 1937, Bostic v. United States, 68 App.D.C. 167, 94 F.2d 636, and a petition for a writ of certiorari was denied by the Supreme Court on January 31, 1938, 303 U.S. 635, 58 S.Ct. 523, 82 L.Ed. 1095. Other review proceedings, which need not be recapitulated here, were then instituted *seriatim* and the date of execution was postponed from time to time. In this manner over three years elapsed from the time that the defendant had been sentenced to death.

The defendant apparently then began to show signs of having lost his mind. This result is not surprising in view of the suspense and tension that must be caused by several years' confinement in a

death cell, while he awaited a final decision as to whether he was to be executed.[1] On the basis of affidavits of several psychiatrists, which are contained in the file, a lunacy inquisition was held and on May 29, 1940, the defendant was adjudged to have become of unsound mind. A transfer to Saint Elizabeths Hospital for the mentally ill was ordered, and the execution of the sentence of death was suspended and held in abeyance until he would be restored to sanity.

About nine years later, on July 7, 1949, the Superintendent of Saint Elizabeths Hospital submitted a formal certificate to the court that the defendant was no longer of unsound mind. The defendant was then transferred from the hospital to the jail. On the basis of this certificate the United States Attorney brought the matter to the attention of the court and requested that a new date of execution be set. This suggestion came before me, as I was then sitting in the criminal division of the court. It seemed to me to be almost macabre to order a death sentence to be carried into effect over twelve years after it was first imposed, and nine years after the defendant had been committed to a mental hospital. Accordingly, I declined to accept the *ex parte* certificate as conclusive, as had been the usual practice in such matters, and ordered that a lunacy hearing take place.[2] Accordingly, a hearing was held before me and a jury on October 6, 1949, and an issue of fact developed as to whether the defendant's sanity had been fully restored. The court ruled that the burden of proof on that issue was on the Government. The culmination of the proceeding was that the defendant was found to be still of unsound mind and was recommitted by me to a mental hospital. On April 17, 1951, President Truman commuted the death

sentence to imprisonment for ninety-nine years. Eventually the defendant was found to have been restored to sanity and was transferred to the Atlanta Penitentiary, where he is now serving his sentence.

On October 24, 1960, his present counsel filed a motion to vacate the sentence and for a new trial, or a dismissal. As heretofore stated, in addition to reviewing the entire file, and all the records of the court pertaining to this case, including the transcript of the testimony at the trial, the court held a preliminary oral argument on the question whether the defendant was entitled to a hearing on the merits of his motion. This argument was held on March 24, 1961, after a number of continuances which were requested by counsel for the defendant.

■ Counsel for the defendant stated that the evidence which he desires to introduce in support of the motion is testimony of some of the psychiatrists who examined the defendant in 1940, when he was found of unsound mind after over three years' incarceration in a death cell in jail. Opinions to the effect that the defendant was then suffering from a mental disease or even that he was of a low order of mentality generally would not justify a conclusion as to what his mental state had been three years previously, especially in view of the supervening events. More than that, the issue whether a person is competent to stand trial presents a different problem than merely the presence or absence of mental disease or a mental defect. The question becomes whether the defendant understood the nature of the proceedings and was able to consult with counsel intelligently at the particular time when his trial took place. Many insane persons as well as

---

1. Compare the English practice under which a sentence of death is either affirmed and carried out, or reversed and set aside, or commuted, within a month or six weeks, at the most, after the trial. The English view is that the prolonged mental agony and suspense are unnecessary torture and add to the punishment.

2. Subsequently, the Court of Appeals decided in Gunther v. United States, 94 U.S.App.D.C. 243, 215 F.2d 493, that such an *ex parte* certificate of the Superintendent of Saint Elizabeths Hospital, should not be accepted as conclusive, but that the defendant is entitled to a hearing on the issue of his competency to stand trial.

many feebleminded individuals or morons are competent to stand trial within that test. Actually while the presence or absence of a mental disease or a mental defect is largely a medical question, the issue of competency to stand trial is a matter that can be determined by a layman. A layman can ascertain whether a person understands the nature of the proceedings and is able to consult with counsel intelligently. Obviously, psychiatrists who examined the defendant three years after the trial are not in a position to express an opinion whether on the day of his trial the defendant understood the nature of the proceedings and was able to consult with counsel.

The court has read the transcript of the defendant's testimony at his trial. His testimony was both intelligent and rational. He narrated in detail the altercation which preceded the murder. He recounted the fact that the deceased made a gesture as though he was about to take out a knife and that he, the defendant, thereupon pulled out a gun and fired at the deceased. His own testimony is the most convincing and strongest evidence that he was competent to stand trial.

There is another aspect of the matter that must be considered. An enquiry directed by the court to the Assistant United States Attorney at the time of the oral argument elicited the information that it would be extremely difficult for the Government to prove its case at this time, if the defendant were granted a new trial. Very likely this is an understatement and, actually, it would probably be impossible for the Government to prove its case. Even if any of the witnesses were available, they could hardly withstand searching cross-examination concerning events that took place twenty-four years ago. Very few persons can do so.

The interests of the public must be protected to the same extent as those of the defendant. It was said by Mr. Justice Cardozo, in Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674, that

> " * * * justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

Judge Learned Hand made the following sage observations in United States v. Garsson, D.C., 291 F. 646, 649:

> "Our dangers do not lie in too little tenderness to the accused. Our procedure has been always haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstructs, delays, and defeats the prosecution of crime."

Some years ago, Mr. Justice Holmes in a dissenting opinion in Kepner v. United States, 195 U.S. 100, 134, 24 S.Ct. 797, 806, 49 L.Ed. 114, observed that, "At the present time in this country there is more danger that criminals will escape justice than that they will be subjected to tyranny."

Recently an eminent English jurist, Mr. Justice Devlin, stated:[3]

> "When a criminal goes free, it is as much a failure of abstract justice as when an innocent man is convicted."

At the oral argument the court evinced some curiosity as to how the present motion originated. Counsel for the defendant stated that he had represented another prisoner confined at Atlanta Penitentiary; that Bostic obtained counsel's name from the other prisoner, and wrote a letter to counsel requesting him to bring some proceeding in order to accelerate the defendant's parole eligibility date;[4] and counsel replied suggesting that instead a motion might be filed to set aside the conviction on the ground of mental incompetency to stand trial.

---

3. Sir Patrick Devlin—The Criminal Prosecution in England, p. 135.

4. This obviously indicates that the defendant is capable of rational thinking.

174

■ In recent years the Federal courts have been flooded with motions under 28 U.S.C. § 2255, most of which are utterly without merit. It must be borne in mind that in each instance the defendant has had his day in court, had been convicted, and had an opportunity for direct appellate review. In each instance there is a final adjudication of guilt. The intent of Congress in enacting this statute was to provide an extraordinary remedy for an exceptional case where a miscarriage of justice has occurred, and not an additional means for prolonging routine litigation.

The District of Columbia has been a particular victim of these motions. Thus, in the fiscal year 1959, the total number of such motions filed throughout the Federal judicial system was 494. Of this aggregate, 192 motions, or almost 40% were filed in the District of Columbia alone. The balance was distributed among the other ten circuits. The second largest number was in the Fifth Circuit, where 53 such motions were filed, distributed among 16 districts. In the fiscal year 1960, the aggregate of such motions rose to 538, of which 221, or over 41%, were filed in the District of Columbia. In this instance the Ninth Circuit had the second largest number—94, distributed among 11 districts.[5]

The apt comments of Circuit Judge Pope of the Ninth Circuit in Johnson v. United States, 267 F.2d 813, 815, are pertinent and applicable to the present motion:

"Cases similar to this are currently flooding the courts by the hundreds. This is not an isolated instance of the abuse of § 2255, although candor compels us to say we cannot recall one quite so outrageous as this one. A day to day observation of these cases, as currently proliferated in sundry penitentiaries, suggests the need to build into § 2255 some safeguards to protect the courts against the abuse of their processes which persons like this appellant are now enabled to perpetrate."

■■ The motion and the files and records of the case conclusively show that the defendant is entitled to no relief.

Motion denied.