**UNITED STATES of America, Plaintiff,**

v.

**James BOSTIC, Defendant.**

**Cr. No. 58600.**

United States District Court District of Columbia.

July 5, 1962.

Edward J. Skeens, Washington, D. C., for defendant, for the motion.

David C. Acheson, U. S. Atty., and Oscar Atlshuler, Asst. U. S. Atty., Washington, D. C., for plaintiff, opposed.

HOLTZOFF, District Judge.

This is a motion under 28 U.S.C. § 2255, in behalf of a defendant, who was convicted of murder over twenty-five years ago, to vacate the sentence on the ground that he was mentally incompetent to stand trial.

On February 9, 1937, the defendant James Bostic was convicted of murder in the first degree, after a trial before the late Honorable James M. Proctor, then a judge of this Court, and a jury. On March 19, 1937, the defendant was sentenced to death by electrocution. The conviction was affirmed by the Court of Appeals, 68 App.D.C. 167, 94 F.2d 636. Some years later, the President commuted the sentence to imprisonment. The defendant is serving this sentence at the Atlanta Penitentiary.[1]

On October 24, 1960—more than 24 years after his conviction—, new counsel filed a motion under 28 U.S.C. § 2255, to vacate the sentence on the ground that the defendant back in February 1937 had been mentally incompetent to stand trial. This Court, after a preliminary argument and an examination of all files and records of the case, denied the motion without a full hearing, 192 F.Supp. 170. The Court of Appeals held that the defendant was entitled to a hearing, 298 F.2d 678, Judge Burger strongly dissenting. Accordingly, such a hearing has now been held. Almost a day and a half were devoted to the taking of testimony.

■■ Obviously, the burden of proof on a motion to vacate a sentence under 28 U.S.C. § 2255 is on the moving party, because there is a presumption of regularity of the conviction. The burden is

---

1. The intermediate proceedings in this case are fully summarized in a prior opinion of this Court. United States v. Bostic, 192 F.Supp. 170.

particularly heavy if the issue is one of fact and a long time has elapsed since the trial of the case. While neither the statute of limitations nor laches can bar the assertion of a constitutional right, nevertheless, the passage of time may make it impracticable to retry a case if the motion is granted and a new trial is ordered. No doubt, at times such a motion is a product of an afterthought. Long delay may raise a question of good faith.

■ Actually, an attempt to determine the mental condition and understanding of a human being on a specific date twenty-five years ago, is a formidable task bordering on the fantastic and the bizarre. The subject of mental competency to stand trial presents a much more difficult and complex problem than a determination of the question whether a person was suffering from a mental disease or was afflicted with a mental defect on a particular date in the distant past. The presence or absence of mental disease or mental defect is solely a medical matter. On the other hand, competency to stand trial, which involves capacity to understand the nature of the proceedings and to advise with counsel comprises additional factors. A person suffering from a mental disease may, nevertheless, be able to comprehend the nature of the proceedings against him and consult with counsel. This occurs frequently.[2] Moreover, at the time immediately preceding and during his trial, an afflicted person may have a lucid interval or be in a temporary state of remission. Accordingly, Dr. David J. Owens, of the staff of Saint Elizabeths Hospital, testified at this hearing that it is not practicable for a psychiatrist who examines a person several years after the event, to express an opinion whether at the earlier date that person was competent to stand trial.

It so happens, however, that in this instance, clear and convincing evidence on this point was available. While the burden of proof was on the moving party and accordingly counsel for the defendant presented evidence in support of the motion, the Court as a matter of convenience, will review the evidence introduced by the Government in opposition to the motion, before summarizing that adduced in support of the application.

Dr. Roger Cohen, a psychiatrist, testified that he had been retained by trial counsel for Bostic, to make a mental examination, and that he conducted such an examination on February 5, 1937,—a few days before the original trial. Dr. Cohen further testified that as a result of a thorough mental, psychological and neurological examination, he reached the conclusion that Bostic was of sound mind, at that time. The doctor stated that although Bostic was not an educated man, he was intelligent and "keen, alert and smart". He expressed the opinion that Bostic comprehended the nature of the murder charge and was able to consult with counsel. He indicated that he had a vivid recollection of the story of the slaying as told him by Bostic.

■ Mr. Joseph Sitnick, a member of the bar who was counsel for Bostic at his trial, testified at a lunacy inquisition in May, 1940. His testimony was made a part of the record on this motion. The pertinent portions of his testimony are as follows:

"Q. Were you able to confer with Bostic and prepare a defense for him?

"A. Yes, sir.

"Q. From the information he conveyed to you?

"A. Yes, sir."[3]

At his trial Bostic took the witness stand and testified in his own behalf

2. "Presence of a mental illness does not equate with incompetency to stand trial." Feguer v. United States (C.A.8th), 302 F.2d 214, 236. To the same effect, Winn v. United States, 106 U.S.App.D.C. 133, 135, 270 F.2d 326.

3. Under the circumstances of this case, such testimony was not barred by the attorney-client relation, United States v. Wiggins, D.C., 184 F.Supp. 673, 677–678, and cases there cited.

This Court has read the transcript of his testimony. It indicated that Bostic is not a well educated man and makes grammatical errors of the type frequently found among persons such as he, as for instance, the use of verbs in the third person singular when the first person is proper. This circumstance obviously casts no reflection on his sanity, or his mentality. He was subjected to direct, cross and re-direct examination, and gave his version of the murder. Apparently by his story, he sought to support a theory of self-defense. His testimony was well connected and intelligent.

There were no other witnesses called by either side at the hearing on this motion who had an opportunity to observe Bostic at or about the time of his trial. The testimony just reviewed is conclusive that he was competent to stand trial.

■ There is a silent but eloquent circumstance that looms large in support of this conclusion. The experienced trial judge, who is now deceased, had an opportunity to observe and listen to Bostic for a considerable period of time. It might have been otherwise if Bostic had not taken the witness stand but had remained silent. Manifestly, it is reasonable to assume that Judge Proctor would have noticed any mental inability on Bostic's part to comprehend the nature of the charge, or to participate in his defense. Obviously, if Judge Proctor had any doubt on the matter, he would have suspended the trial in order to subject the defendant to a mental examination. The opportunity of the trial judge to listen to the defendant at the trial has been deemed an important and weighty circumstance. United States v. Langston (W.D.Pa.), 204 F.Supp. 323, 324.

■ It seemed to this Court that it might be helpful to conduct an examination of the defendant at this time in order to determine whether he has any mental defect, since ordinarily mental deficiency, unlike a mental disease, is a permanent state and consequently if a person is an imbecile today, presumably he must have been an imbecile twenty-five years ago. Accordingly, such examinations were conducted by two psychologists, each acting separately. Dr. Lawrence Bryan, a clinical psychologist at the Atlanta Penitentiary, where Bostic is confined, testified at this hearing that he had examined Bostic about ten days previously; that while Bostic was of inferior intellect, Bostic was not mentally deficient, but was within the lower range of normality, with an intelligence quotient of 77.

Dr. James E. Greene, another psychologist, testified that he recently examined Bostic and found the latter to be within the lower range of normality, and above the level of a moron. His test showed an intelligence quotient of 70.

Dr. Margaret Ives, a psychologist at Saint Elizabeths Hospital, testified that she examined Bostic in November 1947, when he was an inmate of that institution, and found him to be above the level of mental deficiency. He was of a dull normal age with an intelligence quotient of 85, which as revised under present standards would be equivalent to 78.

Counsel for the defendant introduced evidence that late in 1940, after Bostic had spent over three years in a death cell in the District of Columbia Jail awaiting execution, which was postponed numerous times, he became insane and as a result of a lunacy hearing held in 1941 was transferred to Saint Elizabeths Hospital.[4] It might be men-

---

4. Unfortunately, it is a frequent occurrence that a death sentence imposed by a Federal or a State court is neither carried out nor set aside for several years to come, and in the meantime, the defendant languishes in a death cell. It is not surprising that the mental agony and torture caused by the prolonged suspense may result in a mental breakdown. No one is to blame for this deplorable situation, but the fault seems attributable to the system. That these delays are not

tioned at this point that he later recovered his sanity;[5] that his death sentence was commuted; and that he was then transferred to the Atlanta Penitentiary.

At the time of the lunacy proceeding in 1940, it was found that Bostic had an intelligence quotient of 41, which would have rated him as an imbecile. Testimony was introduced to the effect, however, that a person who is psychotic, or who is under a severe mental strain, such as one under a death sentence awaiting execution, does not function at his normal mental level, and may make a very poor showing on a test of his mental capacity. Dr. Bryan expressed the opinion that at the time of his trial Bostic must have had a higher intelligence quotient than 41. Dr. Ives advanced the view that in 1940, Bostic must have been mentally ill and greatly disturbed, and that this condition accounted for the poor results of the mental test made at that time.

Counsel for the defendant called Dr. Emery Y. Williams, a psychiatrist, who had examined the defendant in 1940 in connection with the lunacy proceeding then brought against him. Dr. Williams was in doubt whether Bostic could understand the nature of the proceedings in February, 1937, or could help his lawyer at that time. Admittedly, Dr. Williams had not seen him prior to 1940. Dr. Calude Carmichael was also called in behalf of the defendant. He had been a general practitioner and was only beginning work in psychiatry in 1940, when he assisted Dr. Williams in examining Bostic. Dr. Carmichael had not seen Bostic previously. Nevertheless, he expressed the opinion at this hearing that in February, 1937, Bostic had been un-

able to understand the nature of the proceedings against him or to consult with counsel.

Dr. Frederick Watts, a psychologist, who also examined Bostic in 1940 in connection with the lunacy proceeding, suggested with apparent hesitancy that Bostic had been unable to understand the nature of the murder trial or to assist his counsel. On further questioning, however, he qualified his answers by saying that when examined by him Bostic was under great pressure and may not have functioned normally. Dr. Watts also stated that in his opinion Bostic in 1937 had been able to answer counsel's questions and make suggestions.

On the basis of the foregoing evidence, the Court finds as a fact that the defendant has not sustained the burden of proof on the contention that he was mentally incompetent to stand trial in February, 1937. On the contrary, the Court affirmatively finds as a fact that the defendant was competent at that time to understand the nature of the charge and the proceedings against him, and to make his defense and consult with counsel and therefore, was mentally competent to stand trial. Accordingly, the motion to vacate the sentence is denied.

Actually, to vacate the sentence after a lapse of twenty-five years on the basis of this record and under the circumstances of this case, would be a mockery of justice. No doubt, because of the passage of time the Government would be helpless to retry the case if a new trial were ordered. This proceeding presents one of the many striking illustrations of the misuse and the distortion of 28 U.S. C. § 2255. Under ordinary circumstances, after a defendant has been ac-

necessarily an inherent feature of Anglo-American jurisprudence, is demonstrated by the fact that in England ordinarily, a death sentence is finally disposed of, either by being carried into execution, or by being set aside or commuted, within six weeks after it is imposed.

5. After the staff of Saint Elizabeths Hospital determined that Bostic had recovered his sanity, he was transferred back to the District of Columbia jail and the matter came before me on an application by the United States Attorney that a new date be set for his execution. I suggested informally that steps be taken to secure a commutation of his sentence, and this was done.

corded his constitutional right to a trial by jury, and has been convicted; and then has been granted his statutory right to an appellate review and the conviction has been affirmed, the case should be at an end. The maxim *"interest reipublicae ut sit finis litium"* should be as potent and effective now as it has been in the past.

■ The legislation, which eventuated in 28 U.S.C. § 2255 was drafted by an eminent Committee of the Judicial Conference of the United States, headed by the late Judge Parker. It was the intention of the Committee to provide a judicial remedy in lieu of a writ of *habeas corpus* for the unusual and extraordinary case in which a miscarriage of justice has taken place. It was not the purpose of the framers of the measure to furnish an additional mode of routine review of convictions in criminal cases. Nevertheless, the Federal courts have been flooded with such applications, generally originated by prisoners *in propria persona*, but at times initiated by counsel.[6] While very few of these motions result successfully, they create a heavy burden on the courts. Perhaps it is not of any public interest that the labors of individual judges are increased by these proceedings, but it should be of some concern that in busy districts, especially in metropolitan centers, time is devoted to these hearings that would otherwise be used in trying cases on the regular docket.[7] Many judges during the past few years have made adverse comments on this situation.[8]

In Johnson v. United States (C.A. 9th), 267 F.2d 813, Judge Pope suggested that there is a need to build some safeguards into the statute in order to protect the courts against such abuses of process. This suggestion is well founded. It perhaps might be effectuated by Congressional legislation that would confer broader discretion on district judges to grant or deny hearings on such applications.

Motion to vacate sentence is denied.

---

6. In this case the defendant tried to retain his present counsel for the purpose of bringing a proceeding to accelerate his parole eligibility date. Counsel suggested that he would file a motion to set the conviction aside on the ground of mental incompetency to stand trial. (See 192 F. Supp. 170, 173, 2d column, last paragraph.) In other words this motion originated in the mind of counsel. No indication has been found in the voluminous record of this case that Bostic himself has ever claimed on his own initiative that he did not understand the nature of the proceedings against him, or felt that he was

mentally handicapped in presenting his defense. Bostic did not join his counsel in signing the present motion, and no affidavit sworn to by him is attached.

7. For example, in the present instance, this Court suspended the trial of civil jury cases for a day and a half, in order to conduct the present hearing.

8. See McKenna v. Ellis (1959, C.A.5th), 263 F.2d 35, dissenting opinion by Judge Hutcheson; Johnson v. United States (C.A.9th), 267 F.2d 812; Baker v. United States (C.A.9th), 287 F.2d 5, 7.