Linton R. MORDECAI, Jr., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 1260–65.

United States District Court
District of Columbia.

March 8, 1966.

Marilyn Cohen, Legal Aid Agency, Washington, D. C., for petitioner.

Earl J. Silbert, Asst. U. S. Atty., Washington, D. C., for respondent.

YOUNGDAHL, District Judge.

On May 16, 1961, the Juvenile Court of the District of Columbia waived jurisdiction over the offenses for which petitioner Mordecai was subsequently convicted in this Court in two criminal cases, Nos. 450 and 451–61.[1] At arraignment in these cases, petitioner pleaded not guilty. Subsequently, at the request of his retained counsel, he was sent to Saint Elizabeths Hospital for a mental examination. He was returned from the Hospital in September 1961, with a report from the Superintendent stating "that Linton Mordecai, Jr. is mentally competent to understand the nature of the proceedings against him and to consult properly with counsel in his own defense. We find no evidence of mental disease existing at the present time, nor on or about May 9, and 10, 1961 [the time of the commission of the alleged offenses]. He is not suffering from mental deficiency." On January 15, 1962, at a hearing before this Court, petitioner was allowed to withdraw the pleas of not guilty which he had previously entered and enter pleas of guilty to one count of assault with intent to rob in case No. 450–61, and one count of rape in case No. 451–61. On March 9, 1962, he was sentenced by this Court under a provision of the Federal Youth Corrections Act, 18 U.S.C. § 5010(c) (1964), "for a period of twenty years or until properly discharged by the Youth Correction Division of the Board of Parole."

Petitioner has moved under 28 U.S.C. § 2255 (1964) to vacate this sentence and set aside the judgments which were en-

1. The five-count indictment in No. 450–61 charged the defendant with unauthorized use of a vehicle, grand larceny, assault with a dangerous weapon, assault with intent to kill, and assault with intent to rob. The three-count indictment in No. 451–61 charged him with robbery and two rape offenses.

tered upon his guilty pleas.[3] Four grounds are asserted by petitioner to justify awarding the relief which he is seeking: (1) that his retained counsel inadequately assisted him at the time of the proceedings brought against him in the District Court (2) that his guilty pleas were involuntary in that they were induced by promises of a light sentence, (3) that he was not mentally competent at the time he entered his guilty pleas, and (4) that the procedure whereby the Juvenile Court waived jurisdiction over him was invalid because he was not represented by counsel at the time. The Court shall consider these claims, seriatim.

## I. Inadequate Assistance of Counsel

■ Petitioner's contention that he was without effective assistance of counsel at the time of the proceedings against him in this Court has no merit. He claims that his retained counsel did not tell him that two confessions which he made would not be admissible against him at trial[3] and that counsel failed to look into his claim that at the time of the commission of the alleged offenses he was under the influence of a drug and therefore not legally accountable for his actions.

Whether a petitioner may complain of the ineffective assistance of counsel whom he has retained is subject to great doubt. The Fifth Circuit has held that

he may not. Hamilton v. Wilkinson, 271 F.2d 278 (5th Cir. 1959). Cf. Martin v. United States, 101 U.S.App.D.C. 329, 330, 248 F.2d 651, 652 (1957). This issue need not be decided in the case at bar, however, for, even assuming, arguendo, that the effectiveness of the assistance of retained counsel may be challenged, the errors which petitioner claims were committed by counsel reveal that his challenge cannot succeed in this case.

In Edwards v. United States, 103 U.S. App.D.C. 152, 256 F.2d 707, cert. denied, 358 U.S. 847, 79 S.Ct. 74, 3 L.Ed.2d 82 (1958), petitioner complained of the ineffective assistance of counsel who told him that "there is nothing I can do for you" when, in fact, there were things which he allegedly might have done—including moving to suppress an illegally secured confession. The Court refused to overturn a guilty plea in that case holding, first, that convictions should not be overturned unless the proceedings amount to a "mockery of justice," and, second, that in a case involving a guilty plea the only test is whether the plea was voluntarily and understandingly entered.[4]

The Court elaborated by saying that a lawyer's "bad" advice which induces a guilty plea "does not itself make out involuntariness," id. at 155, 256 F.2d at 710, and that " 'understandingly' refers merely to the *meaning* of the charge, and

2. The original handwritten petition was received by the Clerk of the District Court on May 11, 1965. The government's opposition to this petition was filed on June 1, 1965. On June 7, 1965, the Court ordered an attorney appointed for the purpose of "investigating the allegations in the petition and the reply thereto, as well as the files and records of this case and other relevant information; and for the further purpose of submitting to the Court * * * either a supplemental petition setting forth the relief sought and the factual and legal basis therefor, or a memorandum indicating the factual reasons for not submitting such an amended petition." A memorandum was submitted on the basis of which the Court ordered a hearing, the outcome of which is reported in this memorandum. When petitioner's first court-appointed attorney became unavailable, a new attorney

was appointed who has filed a supplemental petition, a second supplemental petition, and an additional statement of points and authorities. The government has answered the supplemental and second supplemental petitions.

3. We assume for the purposes of this motion—without deciding the issue—that the confessions referred to by petitioner would be inadmissible against him at trial.

4. The Court justified this test by saying that when a guilty plea is involved "there are not the baffling complexities which require a lawyer for illumination; if voluntarily and understandingly made, even a layman should expect a plea of guilty to be treated as an honest confession of guilt and a waiver of all defenses known and unknown." Id. 103 U.S.App.D.C. at 154, 256 F.2d at 709.

what acts amount to being *guilty* of the charge, and the *consequences* of pleading guilty thereto, rather than to dilatory or evidentiary defenses," ibid.[5]

Even if this Court were free to depart from the rule in *Edwards,* the most it could do would be to hold a hearing to determine the factual issue of whether petitioner was effectively assisted by his counsel. Having in fact heard testimony in response to petitioner's allegation that counsel improperly advised him to plead guilty, the Court accepts as true and as rendered in good faith the opinion of counsel that the legally competent evidence which the government could have presented in its case against Mordecai was extremely strong and that guilty pleas were the most satisfactory disposition available to him. The Court also finds no support in the testimony for petitioner's allegation that he was denied effective legal assistance because counsel failed to investigate his claim that, at the time of the commission of the alleged crimes, he was acting under the influence of drugs. Counsel's successful efforts to have petitioner sent to Saint Elizabeths Hospital for a mental examination and the Hospital report finding that petitioner had no mental illness indicate that counsel had effectively discharged his duty to investigate petitioner's possible insanity defense.

## II. Guilty Pleas Induced by Promises of Leniency

In Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962), the Supreme Court held that petitioner was entitled to a hearing to determine the truthfulness of his allegation that his guilty plea was induced by the promise of an Assistant United States Attorney that, if he pleaded guilty, he would receive a sentence of no more than twenty years. On the basis of this decision—though not without doubt that the clarity of petitioner's professions of voluntariness at the time of entering his pleas may have made his claim sufficiently "incredible" to justify denial of a hearing, see id. at 495, 82 S.Ct. 510—a hearing was granted to determine whether petitioner's allegations were true.

At the time petitioner entered his guilty pleas, the Court conducted the following thorough examination into his motives for and understanding of his pleas:

THE COURT: Counsel, you are attorney for the defendant, Linton Mordecai, Jr., in this case?

MR. JONES: I am, sir.

THE COURT: Do you wish to make a statement?

MR. JONES: Yes, I do. If Your Honor please, I represent the defendant Linton Mordecai, Jr., here, in which he is indicted in two numbers, Criminal No. 451–61 and Criminal No. 450–61.

I have fully advised my client on many occasions. I have got his advice and I have also submitted to the Court for a portion of this permanent record a statement in this defendant's own handwriting which I wish the Court to consider. And with that advice which I have given my client, he desires at this time to withdraw his plea of not guilty, heretofore entered, and in Criminal Action No. 451–61, he wishes to enter a plea to Count No. 3. He understands that that count charges rape; and in Criminal Action No. 450–61, he wishes to withdraw his plea of not guilty heretofore entered, and enter a plea to the fifth count, which is assault with intent to rob. He understands the *significance* of Count Three and I have fully explained to him the significance of Count Five.

THE COURT: Mr. Mordecai, you heard the statement of your lawyer?

---

5. Although petitioner did not *in haec verba* allege that his pleas were not voluntarily and understandingly entered, he did assert that they were induced by promises of leniency and that he was mentally incompetent at the time. There-fore, implicit in the Court's findings on these allegations, *infra,* Sections II and III, is its finding that the pleas were voluntary and that petitioner understood what he was doing when he entered them.

698

THE DEFENDANT: Yes, sir.

THE COURT: And do you agree that that statement is a correct and true statement?

THE DEFENDANT: Yes, sir.

THE COURT: Your lawyer has talked to you about the seriousness of this case and he has explained to you fully, as he has indicated. Do you agree with that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand, Mr. Mordecai, that if you desire a jury trial, you may have a jury trial? You are entitled to that. If you plead guilty to the two offenses, you will not have a jury trial. All that will be left, then, will be for the Court to pass sentence after getting a presentence investigation report by the Probation Office. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Has any promise been made to you by the United States District Attorney's office, by your attorney, by the Court, or by anyone else as to what your punishment would be if you pled guilty?

THE DEFENDANT: No, sir.

THE COURT: No promise has been made. Does the Court understand, Mr. Mordecai, that you are pleading guilty to these two counts in these two cases, because you admit the facts and you voluntarily want to enter this plea of guilty?

THE DEFENDANT: Yes, sir.

THE COURT: Well, then, I want to ask you whether you understand, when you are pleading guilty to Count Five in Case No. 450–61, whether you understand you are admitting that on or about May 10, 1961, in the District of Columbia, that you with others did feloniously and wilfully make an assault on Joan E. Smith with intent, by force and violence, against resistance,

and putting in fear, to take and carry away valuable goods and property from the person and immediate actual possession of said Joan E. Smith, the offense of assault with intent to commit robbery? Do you admit that as a fact, the fifth count of this indictment?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand also, Mr. Mordecai, that when you are pleading guilty to Count Three in case 451–61, that you are admitting that on or about May 10, 1961, within the District of Columbia, that you had carnal knowledge of a female named Lois I. Hamberger forcibly and against her will—that you admit rape?

THE DEFENDANT: Yes, sir.

THE COURT: You admit that as a fact. I want to read the statement that counsel had handed me that counsel has indicated that you have prepared in your own handwriting.[6] I want you to tell me whether this is a true and correct statement which you have written out in your own handwriting and signed, because the Court wishes to file this for the record. He wishes to have this information before he accepts your plea of guilty in these two cases.

United States District Court Cell Block 1.
January 8, 1962.
Linton Mordecai, Jr.

Now, this statement has been amended just a few moments ago by putting in the counts of the two cases and the numbers of the two cases. You understand that, do you?

THE DEFENDANT: Yes, sir.

THE COURT: This is the way your statement reads:

January 8, 1962. Time 11:30. I am satisfied with my attorney Jones for what he is trying to do for me. And at this time I would like very much to enter a plea of guilty because I am

---

6. This statement became a part of the official record in case No. 451–61. Another handwritten statement, substantially identical to this one, was prepared by petitioner for his lawyer. This statement was introduced at the hearing as Respondent's Exhibit No. 1.

guilty and for no other reason to 451–61, count three of 451–61, count of rape, and count 5, 450–61, count of—it says robbery here, but the offense is assault with intent to commit robbery.

You have signed your name as to these amendments here right now, is that right?

THE DEFENDANT: Yes, sir.

THE COURT: Then you say also here: No promise has been made to me by anybody; my attorney advised me that if I do enter the plea of guilty the Judge could sentence me to life in jail, or he could sentence me to a period of time under the Youth Correction Act, that the sentence will be entirely the Judge's decision, that he could not promise me anything.

I will take the stand and tell what happen, after I enter my plea, if the Judge or the government want me to do do so. The U. S. Attorney has made no promise to me if I do take the stand and tell what happen.

I understand I can go to trial before a jury on Wednesday, January 10, 1962. Well, it is now January 15, 1962, but you understand the difference in the time period?

THE DEFENDANT: Yes, sir.

THE COURT: If I want to. I do not want a jury trial and want to enter a plea of guilty.

This statement is made of my own free will and I understand fully what I am doing.

The signature is Linton Mordecai, CB–1 Cell 207, 12:30 p. m.

Did you sign such a statement?

THE DEFENDANT: Yes, sir.

THE COURT: Is this a true and correct statement of your desires in this case?

THE DEFENDANT: Yes, sir.

MR. JONES: May it be filed, Your Honor?

THE COURT: Yes, I will file it.

THE DEPUTY CLERK: Linton Mordecai, Jr., in Criminal Case No. 450–61, do you wish to withdraw your plea of not guilty, heretofore entered, and enter a plea of guilty to assault with intent to commit robbery—

THE COURT: Read the charge just as it is. Do this in each case.

THE DEPUTY CLERK: Yes, sir.

Linton Mordecai, Jr., in Criminal Case No. 450–61, do you wish to withdraw your plea of not guilty, heretofore entered, and enter a plea of guilty to Count Five of the indictment which reads as follows:

On or about May 10, 1961, within the District of Columbia, Linton Mordecai, Jr., and Ronald K. Payne, feloniously and wilfully did make an assault on Joan E. Smith, with intent, by force and violence and against resistance and by putting in fear, to take and carry away valuable goods and property from the person and from the immediate actual possession of the said Joan E. Smith.

THE COURT: What is the answer, please?

THE DEFENDANT: Yes, sir.

THE COURT: What is your plea to this?

THE DEFENDANT: Guilty.

THE DEPUTY CLERK: And in Criminal Case No. 451–61, in which you have heretofore pled not guilty, do you wish to withdraw your plea of not guilty, heretofore entered, and enter a plea of guilty to Count Three of the indictment, which reads as follows:

On or about May 10, 1961, within the District of Columbia, Linton Mordecai, Jr., and Ronald K. Payne had carnal knowledge of a female named Lois I. Hamberger, forcibly and against her will.

THE COURT: What is your plea?

THE DEFENDANT: Guilty.

THE COURT: The case will be referred to the Probation Office for a presentence investigation.

MR. JONES: Thank you, Your Honor.

THE COURT: The statement of the defendant will be filed.

At the hearing the government read into evidence some of petitioner's testimony at the trial of his co-defendant Payne in which he reiterated that his pleas were voluntary confessions of guilt and were not motivated by any promises of lenient treatment.

In spite of these prior statements, petitioner claimed at the hearing that his pleas were motivated by the statement of Assistant United States Attorney Thomas Flannery that a "deal" had been made to assure him that, in the event he pleaded guilty, he would receive a sentence of not more than six years under the Youth Corrections Act. Mr. Flannery, as a witness, flatly denied that he had made any such statement. Petitioner also accused his counsel of having promised him leniency if he pleaded guilty, an accusation which was similarly denied.

When questioned, petitioner admitted, as his present allegations forced him to admit, that he lied in his previous appearances before the Court. Contrary to petitioner's characterization, the Court finds, in the light of his prior statements of voluntariness, the directly contradictory testimony of Mr. Flannery and of his former lawyer, and his demeanor while testifying, that he was lying at his recent hearing and that his guilty pleas were entirely voluntary, being prompted by no promises of leniency.

### III.  Mental Competency Issue

Petitioner claims that at the time he pleaded guilty he was not mentally competent. He maintains that the Court should have held a hearing at that time to determine his competency and that it failed to do so. Arguing that the law does not permit competency to be determined *nunc pro tunc*, he asserts that his allegation of incompetency entitles him to have his conviction and sentence vacated. For several reasons, the Court does not agree.

■ Petitioner was sent to Saint Elizabeths Hospital under the provisions of D.C. Code § 24–301(a) (1961). Upon his return from the Hospital, he was certified to be mentally competent. "Congress intended that a certification of competency following a § 301(a) referral should be sufficient to authorize the court in its discretion to proceed with the trial *unless* the accused or the Government objects, in which case a hearing must be held to determine competency." Whalem v. United States, 120 U.S.App. D.C. 331, 334, 346 F.2d 812, 815, cert. denied, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965). See also Hunter v. United States, 116 U.S.App.D.C. 323, 325, 323 F.2d 625, 627 (1963), rehearing denied, 119 U.S.App.D.C. 174, 338 F.2d 283 (1964) (Bazelon, C. J., dissenting), cert. denied, 380 U.S. 918, 85 S.Ct. 912, 13 L.Ed.2d 803 (1965). Of course, under the circumstances of petitioner's pleading guilty—in which petitioner himself, his counsel, and the government were in agreement that the guilty plea be entered—there was no "objection" sufficient to require a hearing.[7] See D.C. Code § 24–301(b) (1961). Therefore this Court—although not bound by the certification of competency—would have been legally justified in deeming petitioner to be mentally competent at the time of his return from Saint Elizabeths *without a hearing*.[8]

7. Petitioner argues that the failure of his counsel to object to the certificate of competency constitutes inadequate assistance of counsel. In the light of what was said *supra*, Section I of this memorandum, regarding the effectiveness of counsel's assistance in recommending that petitioner plead guilty and in investigating petitioner's insanity defense, no basis exists for criticizing counsel for failing to raise any question of mental competency at the time the guilty pleas were entered.

8. At no time has petitioner's case exhibited the kind of circumstances which in Wider v. United States, 121 U.S.App.D.C. 129, 348 F.2d 358 (1965), were held to raise sufficient doubt about the accused's competency to require the District Judge to exercise his discretion by way of conducting a further investigation into competency.

Nevertheless at the time petitioner pleaded guilty the Court carefully examined him to find out whether his pleas were being entered voluntarily, understandingly, and intelligently. The Court was impressed at that time with the responsive answers petitioner gave to the questions asked of him and with petitioner's demeanor, which indicated an awareness of the consequences of his actions. Petitioner would not have been permitted to plead guilty had the Court's impression been otherwise. Under the circumstances existing in this case when the guilty pleas were entered—when an adversary-style inquiry into mental capacity would not have been possible—the Court, even if requested by counsel or by the Assistant United States Attorney to make a specific finding on the issue of competency, would not have conducted a hearing substantially different from what actually took place.

█ Even if this Court were to find that it erred at the time petitioner pleaded guilty in denying him the hearing on the issue of competency to which he was entitled a *nunc pro tunc* hearing would be the most which petitioner could now demand. The cases of Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed. 2d 824 (1960); and Wider v. United States, 121 U.S.App.D.C. 129, 348 F.2d 358 (1965), are not *contra*. These cases, holding that inadequate determinations of competency cannot be cured by *nunc pro tunc* hearings, involved direct appeals and are not controlling in the instant proceeding which involves collateral attack. In Hunter v. United States, supra, our Court of Appeals, in another proceeding

under 28 U.S.C. § 2255 (1964), said that petitioner was at the most entitled to a *nunc pro tunc* hearing on the issue of competency.[9] 116 U.S.App.D.C. at 325–326, 323 F.2d at 627–628. In Bostic v. United States, 112 U.S.App.D.C. 17, 298 F.2d 678 (1961), the Court of Appeals ordered a *nunc pro tunc* hearing to be held to determine competency where the petitioner had been convicted over twenty years earlier.[10] Such a hearing was held before Judge Holtzoff, and his finding against petitioner was affirmed on appeal. Bostic v. United States, 206 F. Supp. 855 (D.D.C.1962), aff'd per curiam, 115 U.S.App.D.C. 79, 317 F.2d 143 (1963). The significance of the decisions in *Hunter* and *Bostic* is magnified by the fact that both were decided after the Supreme Court's decision in *Dusky*.

At the hearing testimony was introduced concerning petitioner's competency at the time he pleaded guilty. Petitioner relied upon a notation in the records of Saint Elizabeths Hospital which he asserts indicates that five out of seven conferring doctors believed that he was incompetent. However, Dr. Owens, who had participated at the medical staff conference which discussed Mordecai's case, testified that the notation referred to by petitioner was erroneous and that two doctors at the most felt that he was suffering from a mental disease or defect. Dr. Owens further stated that he considered Mordecai to have been competent when he left Saint Elizabeths, and this opinion was shared by Dr. Platkin who also testified. Petitioner's former counsel had indicated in his testimony that peti-

9. Even if Chief Judge Bazelon's opinion dissenting from the denial of rehearing were the law, petitioner Mordecai would not be entitled to relief. Chief Judge Bazelon said, "I think Dusky v. United States * * * means that the existence of substantial doubts of competency at the time of trial or plea, plus a failure adequately to determine competency at trial or plea, is sufficient [to require post-conviction relief]." 119 U.S.App. D.C. at 175, 338 F.2d at 284. Chief Judge Bazelon seems clearly to have excluded the instant case—in which the

record and the hearing so clearly indicate that plaintiff was competent at the time of his guilty pleas and in which this Court has at no time had "substantial doubts" regarding petitioner's competency —from the ambit of his definition of the situation in which the severe *Dusky* rule forbidding *nunc pro tunc* determinations of competency must be applied.

10. Judges Edgerton and Washington were in the majority; Judge Burger dissented on the even more restrictive ground that petitioner was entitled to no hearing at all.

tioner had expressed a desire to "bug out"—to feign mental illness—before he went to the Hospital for examination, and both doctors concurred that petitioner's attitude and conduct, both at the Hospital and outside it, were consistent with malingering.

■ Virtually the only testimony offered at the hearing favorable to petitioner's position on competency was offered by Dr. Beardsley, a psychologist, who testified that, on the basis of psychological tests given petitioner, she felt that he had a mental illness.[11] However, in the light of the efforts petitioner was apparently making to feign mental illness, the results of these tests seem inconclusive. The Court finds that the overwhelming evidence points to the fact that petitioner was competent when he pleaded guilty.

### IV. The Juvenile Court's Waiver of Jurisdiction

Petitioner's final contention is that he is entitled to relief because he was not represented by nor informed of his right to counsel at the time the Juvenile Court waived jurisdiction over him. See D.C. Code § 11–914 (1961), now § 11–1553 (Supp. V, 1965). The government does not dispute the factual allegations which petitioner makes on this point.

The government argues, however, that petitioner is not legally entitled to relief. Black v. United States, D.C.Cir., 355 F.2d 104 (1965), reversed a District Court conviction which followed a waiver by the Juvenile Court in the absence of counsel. The government maintains that Black was based upon policy considerations implicit in the Juvenile Court Act and the Legal Aid Act[12] and that it did not rest on constitutional grounds. The government contends that, since the infringement of a statutory right does not afford a basis for collateral relief, Sunal v.

Large, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947), petitioner is entitled to no relief here.

Although there is no indication in Black that the decision has constitutional underpinnings, other decisions involving the Juvenile Court have held that constitutional rights carry over into this area from the general area of the criminal law. See, e. g., In re Poff, 135 F.Supp. 224 (D.D.C.1955) (constitutional right to counsel in Juvenile Court guilt-determining proceedings). The right to counsel which Black protects would seem to be based upon considerations of fairness similar to those which have formed the basis for many constitutional rulings in the area of right to counsel, and this Court finds it difficult to see how Congress could deny a suspected juvenile offender counsel at a waiver hearing, even if it wanted to do so. However, the Court finds it unnecessary to decide this point in the light of the view it takes below on the retroactivity of the Black decision.

The government argues that Black ought not to be given retroactive effect by this Court in a proceeding under 28 U.S.C. § 2255 (1964). First it contends that the Black opinion itself suggests prospective application only, because the decision outlined what the District Court should do in two kinds of post-Black waiver cases—namely, those in which trial had not taken place, and those in which trial had taken place but conviction had not yet become final—but ignored mentioning the disposition of cases, like the present one, where convictions had become final. However, the Court does not read this silence as indicating any view, one way or the other, on how the present case must be decided. Judicial silence—like legislative silence—is usually ambiguous and is frequently an invitation to others to perform intersticial decisional functions.

11. Petitioner introduced certain records indicating mental disturbances after his conviction. These are of very slight probative value. On the one hand, no oral testimony was offered to elaborate upon the alleged disturbances indicated in the records. On the other hand, their occurrence after conviction would not show that mental illness existed at the time of conviction.

12. See D.C.Code §§ 2–2201 to 2–2210 (1961).

In two recent cases the Supreme Court has indicated that all decisions in the area of criminal rights are not to be given retroactive effect, in the sense that they may be relied upon by petitioners seeking to attack their convictions collaterally. Tehan v. United States, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). These decisions reflect the concern of the Court for the disruptive effect which certain of its new constitutional decisions in the area of criminal law might have were they to be given full retroactive application. In order to decide which decisions should be applied retroactively, the courts are required to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." 381 U.S. at 629, 85 S.Ct. at 1738. One of the tests to be applied in this weighing process is whether the particular decision involved is related to the fairness of the trial and the accurateness of the guilt-determining process or whether it is a rule which has other social purposes. See id. at 639; see also Mishkin, the Supreme Court 1964 Term—Foreword: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv.L.Rev. 56 (1966).

In considering the history of the *Black* rule, one finds that, unlike the decisions the retroactivity of which were considered in *Linkletter* and *Tehan*, *Black* does not involve a reversal of a previous decision sanctioning a practice now found illegal. However, it appears that the practice in waiver proceedings in the Juvenile Court has been not to supply counsel, and the Court of Appeals implicitly recognized the existence of this practice when it set down the guidelines referred to above to help the District Court deal with anticipated post-*Black* waiver cases. To upset Mordecai's conviction—and those of others like him who were waived without counsel—will have a disruptive effect in this jurisdiction similar to the one which the Court attempted to avoid in *Linkletter* and *Tehan*.

■ Moreover, the right recognized in *Black* is not one related to the truthfulness of the guilt-determining process. The presence of counsel at a waiver hearing would seem to have even less to do with the "fairness of the trial—the very integrity of the fact-finding process," *Linkletter* v. Walker, supra, 381 U.S. at 639, 85 S.Ct. at 1743—than the rule forbidding prosecutors to comment on the accused's failure to testify which was considered in *Tehan* and found not to be aimed at guaranteeing a fair trial. *Black* rests not on any notion that an innocent man may be found guilty if counsel is not present at the waiver proceedings but on the growing awareness that the process by which the State deals with criminal conduct is an intricate one in which counsel may be helpful at every stage—not only during the trial. This humanitarian rule, although properly a subject for future application, should not be available to reverse convictions following fair trials long after they have become final.

■ Petitioner has not asserted that the *Black* rule is related to the truthfulness of the trial process. He has urged, however, that *Black*, unlike *Linkletter* and *Tehan*, involves the jurisdiction of the trial court, and that a different result as to its retroactivity is therefore required. The Court does not agree. There can be no doubt that the courts of the District of Columbia had jurisdiction of petitioner's person and of the offenses he allegedly committed. By providing in D.C.Code §§ 11–906, 11–907 (1961), now § 11–1551 (Supp. V, 1965), that the jurisdiction of the Juvenile Court is "original and exclusive," Congress was merely effecting an allocation of functions between the Juvenile Court and this Court, and its purposes in so doing will not be furthered by viewing the two courts as separate and distinct jurisdictional entities when errors in waiver procedures are challenged. Instead, the appropriateness of awarding relief in such cases

should, as in cases where only one court is involved, depend upon a weighing of those very factors bearing on the nature and seriousness of the alleged error which the Court has already considered and found to be insufficient to justify its awarding collateral relief in this case.

This Court having determined that petitioner was effectively assisted by counsel at the time of the proceedings against him in this Court, that his guilty pleas were entered voluntarily, that he was mentally competent at the time he pleaded guilty, and that the absence of counsel at the waiver hearing in the Juvenile Court does not justify relief under 28 U.S.C. § 2255 (1964), the motion to vacate sentence must be, and hereby is, denied.