**John Kent SMITH**

v.

**UNITED STATES of America.**

**Civ. A. No. 18279.**

United States District Court
D. Maryland.

Dec. 15, 1967.

William B. Kempton, Baltimore, Md., appointed by the court to represent petitioner.

Stephen H. Sachs, U. S. Atty., and Paul M. Rosenberg, Asst. U. S. Atty., Baltimore, Md., for the Government.

NORTHROP, District Judge.

On May 20, 1964, a jury in the United States District Court for the District of Maryland found John Kent Smith guilty on three counts of a six-count indictment charging violations of Title 18, United States Code, Sections 371, 2113, 2113(a), (b), (c), and (d), 2312, and 2. Petitioner was sentenced by the then District Court Judge Winter to ten years' imprisonment on the second and third counts charging violation of Sections 2113(a), 2, and 2113(b), and 2, in the robbery on July 8, 1963, of the Eastover Branch of the Citizens National Bank of Oxon Hill, Maryland, and aiding and abetting. Smith was further sentenced on the sixth count, charging violation of Section 2312 and 2, in the transportation in interstate commerce of a stolen motor vehicle and aiding and abetting. Both sentences were imposed to run consecutively.

The Court of Appeals for the Fourth Circuit affirmed the judgment, 342 F.2d 525 (4th Cir. 1965), and a petition for certiorari to the United States Supreme Court was denied, 381 U.S. 913, 85 S.Ct. 1535, 14 L.Ed.2d 434 (1965).

■ Under Section 2255 of Title 28, United States Code, Smith advances four separate grounds for relief:

1. There was a denial of due process and a fair trial because certain witnesses falsely testified, and the prosecuting attorney, although knowing the testimony to be false, made no effort to correct it.

2. His constitutional rights under the Fifth and Sixth Amendments to a fair trial were violated by his being absent at critical stages of the trial proceedings.

3. The conviction and sentence imposed under counts two, three and six are a violation of his constitutional rights in that he was subjected to double jeopardy.

4. The arrest made by agents of the Federal Bureau of Investigation on July 15, 1963, was illegal and in violation of the Constitution and laws of the United States.

The petitioner alleges that

"the errors complained of herein have never been presented for review * * * for the reason these errors were *dehors* the record and were unknown to your petitioner until recently."

An examination of the record discloses otherwise. All of petitioner's grounds for relief herein raised were as evident at the time of his trial and/or appeal as they are now and, thus, ordinarily cannot be raised in a Section 2255 motion. McDowell v. United States, 336 F.2d 435 (6th Cir. 1964), cert. denied, 379 U.S. 980, 85 S.Ct. 685, 13 L.Ed.2d 571 (1965); Medrano v. United States, 315 F.2d 361 (9th Cir. 1963); Ingram v. United States, 299 F.2d 351 (5th Cir. 1962); McFarlane v. United States, 231 F.Supp. 191 (S.D.N.Y.1964).

■ Many courts have alluded to the abuse of post-conviction remedies in general, including Section 2255, Johnson v. United States, 267 F.2d 813 (9th Cir. 1959); United States v. Cooper, 222 F. Supp. 661 (D.D.C.1963). In part the

abuse is the result of the notion that these procedures provide a routine review of convictions and sentences at the whim of the defendant who is dissatisfied with his sentence. United States v. Cooper, supra, at 664.[1]

That Section 2255 is available only in the extraordinary and unusual case is evidenced by the clear language of the statute. Thus, in order for the district court to give relief it must find

> "that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."

Title 28, U.S.C. § 2255. Besides the fact, as noted above, that all of petitioner's grounds for relief could have and should have been raised at the instance of his appeal from his conviction it is clear that several of his contentions are not cognizable in this type of proceeding. McFarlane v. United States, supra (arrest without a warrant); Boisen v. United States, 181 F.Supp. 349 (S.D.N.Y. 1960) (double jeopardy). On these two grounds, a strict and literal interpretation of the statute and the cases thereunder would ordinarily lead this court to reject summarily a claim for relief. However, the petitioner has been granted a full hearing. All of his contentions were carefully considered for it is the opinion of this court that the petitioner had presented the unusual case contemplated by the statute, and the court has been liberal in its interpretation of the section so as to enable the petitioner to substantiate his charge of denial of fundamental constitutional rights.

In deciding whether relief was available under this section this court concurs in the decision of United States v. Sobell, 314 F.2d 314 (2d Cir. 1963) wherein that court concluded that relief would be available if the petitioner could show either (1) a significant denial of a constitutional right, even though he could have raised the point on appeal and there was no sufficient reason for not doing so, or (2) a defect seriously affecting his trial, even though not of constitutional magnitude, if it was not correctible on appeal or there were exceptional circumstances excusing the failure to appeal.

Petitioner's first ground is that codefendants who pleaded guilty and testified at his trial on behalf of the government had been promised leniency by the government in consideration for their testimony. He alleges that the government attorneys concealed this fact from the court and opposing counsel, and at trial acquiesced in both codefendants' denials that they had not been the recipients of any promises or considerations from the government in return for their testimony.

█ Smith further intimates that Judge Winter foreclosed the development by his attorney, John Hargrove, of the

---

1. Judge Schaefer of the Supreme Court of Illinois has stated the possible practical reasons for the extraordinary increase in the use of these post-conviction procedures. He posits that the reasons for the increase lie in prison practices and also in the degree of literacy and sophistication among modern-day inmates. He writes in the Harvard Law Review: "Our penitentiary at Joliet has been called the world's largest law school. In addition to having the use of the prison law library, prisoners are allowed to buy their own law books, and each prisoner is allowed to keep a maximum of eight books in his cell. Four hundred of the total four thousand four hundred inmates own typewriters. More than three thousand legal documents a year come from that institution. But if there has been overcompensation, it is hard to blame the wardens who are rightly interested in prison therapy. And prisoners whose energies are directed to getting out of the prison by judicial process are not so likely to be concentrating on other methods of getting out which may be less socially acceptable." 70 Harv.L.Rev. 1, 22 (1956.)

"deal." But the transcript of the colloquy between Mr. Hargrove and the judge does not substantiate this implication.[2]

2. "Again on cross-examination, Sims answered as follows (Pages 299–300 of Transcript).

"Q Were you aware at the time that you gave your statement that your case was to be transferred from New York to Baltimore under Rule 20?

"A Before I gave the statement—

"Q Yes

"A —the whole matter was gone over with me by my counsel, Mr. George Russell. All of the potentialities were explained to me and I was fully aware of all the circumstances before I volunteered to give the statement.

"Q In other words, you were also aware that your case would be transferred from New York if you gave a statement, is that correct?

"A No, I don't think that was—

"THE COURT: Mr. Hargrove, I do not think that that is quite a fair question.

"MR. HARGROVE: Your Honor, this is a fair question.

"THE COURT: No, it is not. You are inferring that if he gives a statement, his case from New York will be transferred to Baltimore.

"MR. HARGROVE: Your Honor, I think I have a right—

"THE COURT: You know very well from your own experience that that is just not a fact.

"MR. HARGROVE: Well, I don't know, Your Honor, I have to find out from him.

"THE COURT: Under the Criminal Rules, Mr. Hargrove, his case could be transferred only if (a) he states he intends to plead guilty; (b) the United States Attorney for the Eastern District of New York consents; and (c) I examine him, determine that it is a free and voluntary choice on his part to request the transfer.

"I will state for the purpose of the record and for the knowledge of the jury that I did examine Mr. Sims and satisfied myself that he understood his rights and that it was a free and voluntary choice on his part before I would permit him to transfer his case from New York, and I examined him a second time before I would permit him to plead guilty to the charge which was transferred the second time.

"Now, against that background, you may continue."

Transcript pp. 301–302:

"THE COURT: You can examine him certainly on what was in his mind, Mr. Hargrove, I am not going to limit you on that, and certainly, you can go beyond my inquiry to see if he understood his rights and that it was a free and voluntary act on his part.

"The only exception I was taking was to the implied misrepresentation— and believe me, I—

"MR. HARGROVE: I beg your pardon. I didn't mean to—

"THE COURT: —recognize that it is inadvertent—implicit in your question. I simply wanted to straighten out the facts of the situation.

"MR. HARGROVE: For the record, Your Honor, I had no intention of suggesting any improprieties on anybody's part except to examine the witness.

"THE COURT: All right. You go ahead and examine him.

"MR. HARGROVE: All right.

"BY MR. HARGROVE:

"Q Now, Mr. Sims, I understand you to say that the whole thing had been discussed with you by your attorney before you entered a plea, is that correct?

"A That is correct.

"Q That includes what Rule 20 encompasses, is that correct?

"A Yes, sir.

"Q And did you agree for him to attempt to get your case here under Rule 20?

"A. Yes I did.

"Q And that, of course, it would mean that he would have to go—certainly, as the Judge has suggested, certain things have to be done in that regard, is that correct? Were you aware of all that?

"A He explained it to me, yes.

"Q And then you did enter a plea and, of course, as His Honor stated, he questioned you as to your reasons and so forth and accepted it, is that correct?

"A That is correct.

"Q And then after that, you gave a statement, is that correct?

"A That is correct.

"Q Now, how soon after did you give the statement?

"A I pleaded on Friday, I believe, and I think that I spoke to Mr. O'Neill that same afternoon."

Redirect by Mr. Kernan (Transcript p. 305):

The gravity of this charge is evidenced by a long series of cases where the Supreme Court has denounced various misconduct on the part of the prosecuting attorneys similar to that alleged by the petitioner. See Giles v. State of Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed. 2d 737 (1967); Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); White v. Ragen, 324 U.S. 760, 65 S.Ct. 978, 89 L.Ed. 1348 (1945); Pyle v. State of Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); and Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). Petitioner relies primarily upon Napue v. People of State of Illinois. In that case a witness for the government falsely testified that he had received no promise of consideration in return for his testimony, though in fact the Assistant State's Attorney had indeed promised the witness consideration and did nothing to correct the false testimony. The court said:

"The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, *and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.*" [Emphasis supplied].

But the conclusionary statement that the government is guilty of misconduct is not sufficient for relief. The petitioner has the burden of proving that perjury was an element in the evidence or testimony presented by the government, and it was material testimony, United States v. Abbinanti, 338 F.2d 331 (2d Cir. 1964), and that this perjury or false testimony was knowingly used or left unchecked by the government, Marcella v. United States, 344 F.2d 876 (9th Cir. 1965).

The petitioner relies primarily upon a letter from the United States Attorney's office, addressed to counsel of two of the defendants charged with the robbery of the Oxon Hill bank, Sims and Ugaro:

/copy/ /copy/
United States Department of Justice

United States Attorney
District of Maryland
409 Post Office Building
Baltimore, Maryland 21202

April 15, 1964

George L. Russell, Jr., Esq.
418 One Charles Center
Baltimore 1, Md.

John Martin Jones, Jr., Esq.
900 First National Bank Building
Baltimore 2, Md.

William T. Winand, Jr., Esq.
2410 Maryland National Bank Building
Baltimore, 2, Md.

Re: U. S. v. Warren Arthur Sims, Roger John Ugaro, et al, etc. Cr. 26448

"Q At the time you entered a plea in this court for the charges here, did you indicate a desire at that time to plead to charges against you in New York?
"A Yes, I did.
"Q And was it fully gone into by the Court, your intention?
"A Well, the Court questioned me as to my willingness to give the testimony and the Court went to great length to explain the various possibilities, and I understood it quite clearly, as Mr. Russell had gone over it with me prior to that.
"Q I see. And isn't it a fact, too, that you and your counsel signed a consent to transfer the case from New York on that date?
"A We did, and the Court.
"Q And it was only subsequent to those two events that you were interviewed and agreed to be interviewed by the FBI?
"A That is correct."

Dear Sir:

Pursuant to our earlier conversations of even date, please be advised that at the time of sentencing of the above-named defendants, if asked by the Court, the office of the United States Attorney will register no objection to the Court's considering the imposition of a concurrent sentence on the charges of bank robbery presently pending in the Eastern District of New York.

In no event will the Government recommend affirmatively that the sentence be made concurrent.

> Very truly yours,
>
> Thomas J. Kenney
> United States Attorney
>
> By /s/ Robert W. Kernan
> _____
> Robert W. Kernan
> Assistant United States
> Attorney

/copy/ /copy/

The substance of the letter is that the government would take a neutral position at the time of sentencing of the defendants, neither recommending nor opposing the imposition of concurrent sentences. At this point, it is necessary to review the events leading up to the writing of the letter in order to understand its relevancy.

The letter is dated April 15, 1964, which was subsequent to the first arraignment of petitioner and the other defendants charged with the Oxon Hill robbery. At that arraignment all the defendants pled not guilty to the several counts in the indictment.

Prior to the robbery of the Oxon Hill bank, the Bensonhurst National Bank of Brooklyn, New York, was robbed on two occasions, and indictments were pending in New York against five of the defendants under indictment for the Oxon Hill robbery, namely Sims, Ugaro, Goody, Chappell, and Ghee. The petitioner was not implicated in the New York robberies in any way.

Sims and Ugaro, as all the defendants in this case, were represented by exceedingly capable and skilled attorneys, well versed in criminal law and procedures. George L. Russell, now judge of the Supreme Bench of Baltimore City, was counsel for Sims. He testified at the hearing that he had advised Sims that it would be to his advantage to transfer for plea and sentence the New York counts, pursuant to Rule 20 of the Federal Rules of Criminal Procedure.[3] Mr.

---

3. Rule 20, Federal Rules of Criminal Procedure:

"Transfer from the District for
Plea and Sentence

"(a) Indictment or Information Pending. A defendant arrested or held in a district other than that in which the indictment or information is pending against him may state in writing that he wishes to plead guilty or nolo contendere, to waive trial in the district in which the indictment or information is pending and to consent to disposition of the case in the district in which he was arrested or is held, subject to the approval of the United States attorney for each district. Upon receipt of the defendant's statement and of the written approval of the United States attorneys, the clerk of the court in which the indictment or information is pending shall transmit the papers in the proceeding or certified copies thereof to the clerk of the court for the district in which the defendant is held and the prosecution shall continue in that district.

"(b) Indictment or Information Not Pending. A defendant arrested on a warrant issued upon a complaint in a district other than the district of arrest may state in writing that he wishes to plead guilty or nolo contendere, to waive trial in the district in which the warrant was issued and to consent to disposition of the case in the district in which he was arrested, subject to the approval of the United States attorney for each district. Upon receipt of the defendant's statement and of the written approval of the United States attorneys and upon the filing of an information or the return of an indictment, the clerk of the court for the district in which the warrant was issued shall transmit the papers in the proceeding or certified copies thereof to the clerk of the court for the district in which the defendant was arrested and the prosecution shall continue in that district. When the defendant is brought before the court to plead to an information filed in the district where the warrant was issued, he may at that time

Jones testified that he and Mr. Winand, both counsel for Ugaro, like Judge Russell, had had conversations with their client and the attorneys for the government, Messrs. Carson and Kernan, about the charges against the defendants. Judge Russell testified that Sims was agreeable to pleading guilty to one count of the Oxon Hill robbery and having one of the New York indictments transferred for plea and sentence provided that the government would set out in writing the position it would take at the time of sentencing. Mr. Jones' testimony regarding Ugaro's disposition was to the same effect.

These circumstances led to Judge Russell's request that the United States Attorney formally state its position in writing. The uniqueness of the letter does not lie in its contents for it was made clear at the hearing by Messrs. Carson, Kernan, and Hargrove, former Assistant United States Attorneys, that this had always been the attitude of the United States Attorney's office regarding matters of sentencing, namely that it was not something with which to become involved. However, it was agreed by all that this was the first instance of such a letter being written stating this policy of the United States Attorney's office.

Each counsel testified that he realized that this "concession" by the government was—using the designation given by

counsel—"nothing", that each defendant was apprised of this, and that despite the letter, "the court would not be bound" at the time of sentencing by any statement made by the United States Attorney's office.

Subsequent to the writing of the letter all the defendants, except the petitioner, pleaded guilty to one count of the Oxon Hill robbery, and Sims and Ugaro consented to the transfer of the count charging the second robbery of the Bensonhurst bank. It is uncontradicted that prior to their re-arraignment both Sims and Ugaro knew of the existence of the letter.

At their second arraignment, as the transcript indicates, Judge Winter questioned the defendants extensively as to whether or not they had of their own volition, and without promises of leniency, determined to change their pleas to guilty. Both defendants testified that it was their own choice to change their pleas, and that they had not been promised leniency by anyone at the time of sentencing.

It is important to note that at no time during several proceedings connected with the various defendants were any of the discussions or transactions relating to the charges, pleas, or testimony initiated by the government. And what is most important is the fact that the possibility that defendants Sims, Ugaro, Goody, or Chappell might testify at the

waive indictment as provided in Rule 7, and the prosecution may continue based upon the information originally filed.

"(c) Effect of Not Guilty Plea. If after the proceeding has been transferred pursuant to subdivision (a) or (b) of this rule the defendant pleads not guilty, the clerk shall return the papers to the court in which the prosecution was commenced and the proceeding shall be restored to the docket of that court. The defendant's statement that he wishes to plead guilty or *nolo contendere* shall not be used against him.

"(d) Juveniles. A juvenile (as defined in 18 U.S.C. § 5031) who is arrested or held in a district other than that in which he is alleged to have committed an act in violation of a law of the United States not punishable by death or life

imprisonment may, after he has been advised by counsel and with the approval of the court and the United States attorney, consent to be proceeded against as a juvenile delinquent in the district in which he is arrested or held. The consent shall be given in writing before the court but only after the court has apprised the juvenile of his rights, including the right to be returned to the district in which he is alleged to have committed the act, and of the consequences of such consent.

"(e) Summons. For the purpose of initiating a transfer under this rule a person who appears in response to a summons issued under Rule 4 shall be treated as if he had been arrested on a warrant in the district of such appearance."

trial of Smith was never mentioned until some time subsequent to the change of pleas and subsequent to the writing of the letter. Any possibility of causality between the letter and the willingness of the defendants to testify is erased by the uncontroverted testimony of Judge Russell and Mr. Jones, counsel for the defendants, and Mr. Kernan. Indeed, Mr. Kernan said Sims' willingness to testify at Smith's trial on behalf of the government came as a complete surprise.

Petitioner argues that whether the government attorneys or the respective counsel for defendants believed that a "promise" was made in return for their testifying is unimportant for the question is whether the defendants themselves believed that their testimony was a part of a "package deal" arranged by counsel with the government. In fact, at Sims' post-conviction hearing for relief under Section 2255, Civil Action No. 15960, Sims testified (pages 110–13 of the transcript of the proceedings) that that, indeed, was his understanding.

If the question to be decided here was the voluntariness of the defendants' guilty plea, then the subjective test of the defendants' state of mind would be relevant. The court in United States ex rel. Thurmond v. Mancusi, D.C., 275 F. Supp. 508 (September 14, 1967), said:

> "If the * * * defendant believes that a promise has been made, the effect on his state of mind is exactly the same as if such a promise had in fact been made."

■■ Petitioner presents here a far different question. This court must determine whether perjury was an element in the case presented by the government and whether this falsity was knowingly used or left uncorrected. There is no evidence that the defendants' denial of having received any consideration for their testifying was false. As noted earlier, the evidence is uncontroverted that there was no causality between the testimony of the defendants and the letter written by the government attorneys. And even if the defendants had believed, and this court makes no

determination as to the reasonableness of such a belief if it in fact existed, that the "concession" made by the government contemplated their testifying in the Smith trial, there is no showing that the government knew or had reason to believe that the defendants were laboring under such a belief.

The petitioner has the burden of showing prosecutorial misconduct by presenting facts. Smith v. United States, 252 F.2d 369 (5th Cir. 1958), cert. denied 357 U.S. 939, 78 S.Ct. 1388, 2 L.Ed.2d 1552 (1958); United States v. Jakalski, 237 F.2d 503 (7th Cir. 1956), cert. denied, 353 U.S. 939, 77 S.Ct. 817, 1 L.Ed. 2d 761 (1957), rehearing denied, 353 U.S. 978, 77 S.Ct. 1061, 1 L.Ed.2d 1139 (1957). Even when the evidence is considered in the light most favorable to the petitioner, this court must conclude that *he has not carried his burden of proof.*

It is regrettable that the integrity of these conscientious government attorneys is unjustifiedly called into question in the present case. But the central role they play in the administration of justice and the wide discretion which is theirs to exercise demands that they be ever open to public and judicial scrutiny. The limits of "civilized standards of procedures", McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), which is our goal, have not been definitively set. We are constantly striving to attain an acceptable standard for the conduct of a fair trial.

While the evidence clearly demonstrates that the government was free from any misconduct at Smith's trial, this court feels that it must comment on the transactions and dealings between the defendants' counsel and the government because of their relevancy to the present case.

■ Here the defendants, Sims and Ugaro, concerned about the inevitability of their conviction, bargained through their respective counsel with the government in an attempt to minimize their potential sentences. Although plea-

bargaining is widely practiced[4] and widely sanctioned, there still remains great misunderstanding surrounding such maneuvers, see Barber v. Gladden, 220 F.Supp. 308, 314 (D.Or.1963). This misunderstanding is caused by it being carried on in secrecy, as if there were some impropriety involved in the practice.

The extent to which details of negotiations must be presented to others not parties to the transactions, namely court and other counsel and other defendants, has not yet been clearly set out. But it should be noted that an attack such as presented here would not have been made, indeed could not have been made, had the government been more candid with respect to its prior dealings with these defendants.[5]

Mr. Hargrove, Smith's counsel, testified at the hearing that even if he had known about the letter written by the government or about the letter written by Sims prior to his testifying, in which letter Sims stated the reasons why he wanted to testify against Smith, this

---

**4.** "The guilty plea has become an important factor in the administration of American law. Guilty pleas are prevalent in the State Courts, and in the Federal District Courts pleas of *nolo contendere* and guilty pleas represent an average of 79 percent of the dispositions of all criminal defendants for the fiscal years 1956 through 1962. The commonplace practice of 'plea-bargaining'—compromises by prosecuting attorneys with criminal defendants or their counsel—is in part responsible for the high incidence of such pleas." Note, Guilty Plea Bargaining: Compromises by Prosecutors to Secure Guilty Pleas, 112 U.Pa.L.Rev. 865–71 (1964).

**5.** For example, Mr. Sims wrote a lengthy letter to the government attorneys after he made known to them his willingness to testify against Smith. Therein he stated his reasons for testifying. Mr. Kernan testified that the letter was unsolicited by the government. Further, for some unexplained reason, he said that the letter made him apprehensive for he was afraid it was Jencks material. The contents of the letter is set out below:

"I decided to plead guilty and to tell all I knew including testifying for the Government for the following reasons.

"(1) I chose not to compound my part of the crimes with lies disguised as a defense.

"(2) I have heard and know to be a fact that two or more of codefendants have made statements consistant [sic] with guilt. I know that some codefendant [sic] are unaware of, or ignorant to, different aspects of the operation or crimes, and possibly made some conflicting statements. Since I was the major planner and excepted [sic] leader of the group, and I was and still am aware of all of the aspects, I feel that I am the only one that can accurately fill in any open gaps and put everything in its proper perspective once and for all.

"(3) Everyone involved was fully aware of the fact that they were conspiring to commit, and participating in, the commission of a major crime. Everyone involved participated voluntarily on his or her own free will. Everyone involved expected to receive, and in fact did receive a percentage of the proceeds. I feel that everyone involved should shoulder his or her share of the ultimate responsibility.

"Having practically completed giving a complete statement to the F.B.I. and the U. S. Attorney I feel relieved and happy. Relieved because having revealed the whole truth I feel unburdened.

"Happy because prior to my volunteering through my court appointed lawyer Mr. George Russell to give a statement, no one during months of confinement attempted to extract a statement from me. Also, my statement was given in the presence of two U. S. Attorney, [sic] one F.B.I. Agent and one U. S. Marshall none of whom made any attempt to put words into my mouth, or sought to make me know what I did not know. I was allowed to recite everything in my own words, from my own memory, I was not offered or promised anything. Having been the recipient of a gross miscarriage of justice at one time in my life solely because I was poor and a Negro I know too well what injustice can do to one. Finally I'm happy for my three and five year old little boys because as long as justice is administered as it has been accorded me during my confinement on the present charges they are insured a pretty bright future.

"Signed, Warren Arthur Sims
"At, Baltimore City Jail
"On, May 5, 1964"

knowledge would not have altered his trial strategy in any way. But because the defendant did not have these details, he now is able to argue, by innuendo and inference, that they mean more than they do, or mean something entirely different. It is true that

"in gauging the nondisclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel." Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842, 846 (4th Cir. 1964).

But it is important to note that Hargrove, petitioner's able and skilled counsel at his trial, did not at the hearing point to any possible prejudice suffered because he did not have the details set out above.

Indeed, the petitioner has not shown in what way he was prejudiced because of the nondisclosure of this material. Mr. Hargrove testified that had he known of the letter when cross-examining Sims and Ugaro, he certainly would not have alluded to it because it meant "nothing" to him, nor does the record reflect that he was prevented from testing the credibility of these witnesses.

■■■■■ Unlike where the question involves the knowing use of false or perjured testimony by the government, the passive nondisclosure of "evidence" does not demand a holding of per se error. Barbee v. Warden, Maryland Penitentiary, supra. After carefully reviewing all the evidence, it is clear that the defendant was not prejudiced in his defense because of the nondisclosure of the existence of the details outlined above.

Petitioner's second contention is that he was denied due process in that he was not present at critical stages of the proceedings. The transcript of the proceedings show that the final argument to the jury and the court's instructions were concluded late in the morning of May 20, 1964, and that the jury retired to deliberate at approximately 12:51 p. m. The jury, at approximately 11:00 p. m., announced the verdict.

After the jury had retired to deliberate and during the course of its deliberations, it sent to Judge Winter a series of notes. The original of these notes and the responses of Judge Winter thereto are contained in the file of the Clerk of the court. The chronology of these notes is not disputed. Sometime between 12:51 p. m. and 4:07 p. m., when the jury was called back into court, three notes were handed to the judge.[6]

---

6. "What is believed to be the first written note in point of time reads as follows: (no time or date)
 " 'We would like to have the entire testimony.
 'Irvin Jaffé, Foreman'
 "The response of Judge Winter to this note (it is suggested) is contained in the following written response written in Judge Winter's handwriting on his stationery as follows: " 'May 20, 1964
 " 'Dear Mr. Foreman:
 " 'The testimony you request has not been transcribed and consequently I cannot send it to you. If there are particular portions which you would like to have, please advise me and I will make an effort to find the notes and have the reporter read them to you.
 " 'Very truly yours,
 " 'Harrison L. Winter'

"Thereafter the jury addressed and delivered to Judge Winter what is believed to be the second note in point of time, which note bears neither date nor time and reads as follows:
 " 'Your Honor
 " '1. Please define the act of conspiracy.
 " '2. Testimony of Roger J. Ugaro pertaining to the stolen cars about June 28 to July 1, 1963.
 " '3. Andrew Chappell, Jr. testimony in regard to John Kent Smith.
 " 'Respectfully
 " 'Irvin Jaffe, Foreman'
 "Apparently Judge Winter did not give an immediate response to the request contained in this particular note. It seems reasonably clear that the jury then addressed and delivered to Judge Winter what is believed to be a third note in point of time, which note bears

After receipt of the second and third notes the jury was summoned to the courtroom by Judge Winter, the proceedings commencing at 4:07 p. m. and concluding at 4:36 p. m. The record of these proceedings may be summarized as follows:

1. Judge Winter reviewed the essentials of his instructions with respect to the crime of conspiracy and thereafter reread a portion of his charge.

2. Judge Winter summarized certain portions of Ugaro's testimony and thereafter the court reporter read certain portions of Ugaro's testimony.

3. Judge Winter stated that if the jury wished to have the entire testimony of Chappell reread, he would arrange to have such done, but he suggested that the jury might have some specific aspect of Chappell's testimony in mind. The foreman stated that he would prefer consulting with the jury as to whether the request could be more specific.

4. Judge Winter stated that the answer to question three submitted by the foreman of the jury was "yes", that a person can aid and abet without being a part of the conspiracy as applies in this case. Judge Winter then gave further instructions as to the essential elements of the crimes charged.

Petitioner claims that he was not present in the courtroom during these proceedings. Although the transcript does not indicate either Smith's absence or presence, Mr. Hargrove, his counsel, testified that he was certain that he was present in the courtroom, and both counsel for the government testified to the same effect. Judge Winter testified that when the jury was brought in the accused was present in the courtroom for he was acutely aware of the necessity for the defendant's presence in the courtroom at all stages of a criminal proceeding. Only the petitioner who, incidentally, was on bond, claims otherwise.

■ The court finds that the petitioner was present for all the proceedings that transpired in the courtroom.

At 4:36 p. m. the jury retired for further deliberations and there is no record of additional proceedings in the courtroom until the jury's return to deliver their verdict at 11:00 p. m.

Sometime between 4:36 p. m. and 11:00 p. m. there were further communications between the jury and Judge Winter.[7] The transcript at page 571

---

neither date nor time and read as follows:—

" 'Can a person aid and abet without being a part of this conspiracy, as applies to this *case*

" 'Your Honor—

" 'Above question is from one of the jurors.

" 'Irvin Jaffe' "

Memorandum on Behalf of John Kent Smith, filed 27 October 1967, pp. 28–29.

**7.** "The first of these in point of time is a letter in Judge Winter's handwriting reading as follows:—(no time)

" 'May 20, 1964

" 'Dear Mr. Jaffe:

" 'Does it appear that there is any likelihood that the jury will reach agreement in the near future or should I make arrangements to send the jury out to dinner.

" 'Please advise.

" 'Very truly yours,

" 'Harrison L. Winter'

"To this Mr. Jaffe apparently responded by a written note reading as follows:—(No date, no time)

" 'Your Honor

" 'It does not appear that the jury will reach an agreement in the next hour or two.

" 'Respectfully,

" 'Irvin Jaffe

" 'Foreman'

"The next communication appears to be in the form of a note directed to Judge Winter bearing a notation '8:40 P.M.' and reading as follows:—

" 'Did your Honor instruct the jury that if the defendant were found guilty of Counts 2 and 3 then they would have to find the defendant guilty of Count Number 4.

" 'Irvin Jaffe'

"Judge Winter apparently responded as follows by a written note dated May 20, 1964 (no time):—

" 'Dear Mr. Jaffe:

" 'My instruction to the jury was that if the jury found Mr. Smith *not*

states that commencing at 11:00 p. m., the proceedings in the courtroom were resumed, and the transcript records a statement of Judge Winter to the effect that during the deliberations of the jury he had received many notes from the jury, to which he had responded, and that counsel had been shown the notes and had approved the replies.

The government concedes that the petitioner was not present at any time in the judge's chambers after the jury initially retired to deliberate at 12:51 p. m. The evidence discloses, however, that not only were the counsel for both the petitioner and the government consulted about each and every note received from the jury and the reply thereto, but that the petitioner was present outside the judge's chambers and was apprised immediately of all that transpired therein. Mr. Hargrove testified that Smith was made aware of all that transpired in chambers. Counsel for the government recalled that Mr. Hargrove absented himself from these proceedings in chambers for brief periods, thus corroborating Hargrove's statement that Smith was immediately informed of developments in chambers. At no time, although aware of the transactions and discussions, did Smith raise an objection.

The government cites Cox v. United States, 309 F.2d 614 (8th Cir. 1962) wherein the court said:

"It is not unusual for a judge to call counsel into chambers and discuss matters of evidence, the form of questions, instructions proposed, and other matters looking to a more orderly trial, without having a defendant present. Appellant's help was not needed by the judge in order to make a ruling. His presence could hinder an orderly discussion. This conference was not a part of the trial within the meaning of Rule 43 [Federal Rules of Criminal Procedure]."

The petitioner concedes that an accused need not be present in chambers when matters of law or legal instructions are discussed, but contends that *Cox* is not controlling when the matters discussed in chambers relate to matters other than of a purely legal nature.

Prior to the recalling of the jury, Judge Winter and counsel conferred as to what parts of the testimony were to be read to the jury. The petitioner was apprised of this decision and was present in the courtroom throughout the reading of this testimony. At no time did the petitioner object to what transpired.

guilty of counts two *and* three, then the jury *must* find him *not* guilty of count four.

" 'If the jury finds Mr. Smith guilty of count two or count three, or both, then the jury should consider also if Mr. Smith is guilty or not guilty of count four in accordance with the rules stated in my instructions.

" 'Very truly yours,
" 'Harrison L. Winter'

"Thereafter Judge Winter addressed the following note to the foreman of the jury which note is dated May 20, 1964 (no time):—

" 'Dear Mr. Jaffe:
" 'Please answer the following questions:

" '(1) Has the jury reached a verdict on any count?

" '(2) As to those counts on which a verdict has not been reached, do you believe that there is any likelihood that agreement will be possible if the jury is given additional time to deliberate? In answering these questions, please do not disclose how the jury stands on any count as to which agreement has not been reached, or the counts involved.

" 'Very truly yours,
" 'Harrison L. Winter'

"It appears that Mr. Jaffe, the foreman, wrote the word 'yes' beside each question and signed the note itself 'respectfully, Irvin Jaffe' and then returned the note to Judge Winter.

"Thereafter it appears that in point of time another note was addressed to Judge Winter, this note bearing neither date nor time and reading as follows:—

" 'Your Honor:
" 'We have reached agreement on three counts, but are unable to reach agreement on the other two counts.

" 'Respectfully,
" 'Irvin Jaffe' "

Memorandum on Behalf of John Kent Smith, filed 27 October 1967, pp. 30–32.

 Assuming *arguendo* that Rule 43 encompasses petitioner's contention, namely that the discussions in chambers relating to matters other than those of a purely legal nature were stages of the proceedings, this court finds that it may be disregarded under Rule 52(a) as an irregularity which could not affect substantial rights of the petitioner. The particular facts of this case, namely that the petitioner was present throughout all the proceedings that transpired in the courtroom and that the petitioner, although absent from the judge's chambers, was apprized of the communications betwen the judge and jury and of the procedure to be followed by the court in answering the jury's questions before any action was taken by the court, in ample time to object for the record, compels this court to hold there was no error in this procedure. There was no action *in camera* which impinged upon the rights of the petitioner in any manner whatsoever.

The third ground raised herein is that the petitioner was subjected to double jeopardy in that he could be convicted either of aiding and abetting a bank robbery as charged in counts two and three of the indictment or of aiding and abetting the interstate transportation of a stolen motor vehicle as charged in count six of the indictment, but that he cannot lawfully be convicted of both crimes under the facts in this case.

He cites Milanovich v. United States, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961) and O'Neill v. United States, 236 F.2d 636 (6th Cir. 1956). In *Milanovich* a husband and wife had been convicted of stealing currency from a commissary store at a naval base. The wife was also convicted of receiving and concealing the same property. The Supreme Court held that the wife could not be convicted both for stealing government property and receiving and concealing the same property, and that there was error in not instructing the jury that the wife could not be convicted of both crimes. In *O'Neill* the defendant had pled guilty to a six-count indictment charging embezzlement from the United States mail, and he was sentenced on each count separately. Since five of the six counts were merely part of and included the continuing offense charged in the other count, imposition of additional sentences under all the counts constituted multiple punishment in violation of the Fifth Amendment.

These cases relied upon by the petitioner are in no way analogous to the case at hand. In the present case the United States used simultaneous prosecutions involving separate and distinguishable offenses, and thus this case is not covered by the principles advocated by petitioner. United States v. Gills, 357 F.2d 299 (4th Cir. 1966), cert. denied, 384 U.S. 933, 86 S.Ct. 1448, 16 L.Ed.2d 532 (1966).

The Fifth Amendment to the United States Constitution provides in part:

> "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb * * *."

 The government cites the proposition that

> "it is an elementary principle of law that a single act can subject the actor to punishment under two Statutes"

as long as the statutes define separate crimes. United States v. Gills, supra; McGann v. United States, 261 F.2d 956 (4th Cir. 1958); Harris v. United States, 359 U.S. 19, 79 S.Ct. 560, 3 L.Ed.2d 597 (1959). The two statutes under which the petitioner was convicted are not interrelated, but are separate and distinct crimes, distinguishable by the activity covered and by the proof necessary to convict. The ordinary test for determining whether there are two offenses or one, within the contemplation of the Fifth Amendment, is whether each requires proof of an additional fact which the other does not.

 The constitutional guaranty against "double jeopardy" is against jeopardy for the same offense and not against repetition of evidence at trial for different offenses or against incidental proving of some other offense if

such offense is one which has not theretofore been charged and prosecuted. United States v. Brimsdon, 23 F.Supp. 510 (D.Mo.1938).

■ Thus, the mere fact that evidence relating to the theft of a car was part of the evidence presented to show violations by the petitioner of two statutes does not mean he has twice been put in jeopardy for the same offense.

The final basis for relief presented here is that the arrest made by agents of the Federal Bureau of Investigation on July 15, 1963, was illegal and in violation of the Constitution of the United States and the Laws of the United States.

■ At the hearing it was stipulated by the parties that

"the petitioner was actually arrested without a warrant pursuant to an authorization from the office of the United States Attorney for the District of Maryland. That the Federal Bureau of Investigation made the arrest pursuant to their authority to make arrests without a warrant in a felony case. The arrest occurred on July 15, 1963, at approximately between 11:30 P.M. and midnight. The next day, July 16, 1963 a warrant was obtained and one of the F.B.I. Agents who arrested the petitioner on July 15, 1963, indicated on the warrant obtained, that the warrant was executed on July 15, 1963, the date the actual arrest took place. It was then and is now, the usual practice for the Federal Bureau of Investigation to obtain a warrant after an arrest when an individual is originally arrested without a warrant."

Only this stipulation was offered at the hearing. There is no allegation that the petitioner would have been entitled to the suppression of any evidence obtained as a result of an alleged illegal arrest, and it was stipulated that there were no "fruits" of an illegal arrest presented at petitioner's trial. In any event, it appears that this claim was not seriously contended by petitioner. And it is not grounds for a collateral attack on a conviction. Moreland v. United States, 347 F.2d 376 (10th Cir. 1965); United States v. Koptik, 300 F.2d 19 (7th Cir. 1962), cert. denied, 370 U.S. 957, 82 S.Ct. 1609, 8 L.Ed.2d 823.

The motion is denied.