UNITED STATES of America

v.

Robert Roy WOODWARD.

Crim. No. 77–117.

United States District Court,
W. D. Pennsylvania.

Dec. 26, 1979.

James West, U. S. Atty., Pittsburgh, Pa., for United States.

William Scarpatti, Erie, Pa., for defendant.

## OPINION

KNOX, District Judge.

The Court of Appeals for the Third Circuit has remanded this cause for our initial determination of defendant Robert Roy Woodward's contention that the Fifth Amendment's protection against double jeopardy as incorporated in the doctrine of collateral estoppel bars his conviction for perjury under 18 U.S.C. § 1623. *U. S. v. Woodward*, No. 78–1864, 595 F.2d 1215 (3d Cir. March 9, 1979 as amended March 28, 1979).

## INTRODUCTION

The perjury charge arose out of testimony Woodward gave in his own behalf at an earlier trial in which he was charged with eight counts of transporting forged checks in interstate commerce in violation of 18 U.S.C. § 2314 and aiding and abetting in violation of 18 U.S.C. § 2 and one count of conspiring to commit the above offenses in violation of 18 U.S.C. § 371. Defendant was acquitted upon a general verdict on all counts following a trial held before Chief Judge Weber of this court. The government's theory as summarized by the Circuit, was as follows:

"Woodward had stolen blank checks from the J. Miller Express Company and had stolen a typewriter from the W and W

Trucking Company. A checkwriter was also procured as part of the scheme and was put in the custody of a woman named Susan Walker. The typewriter and checkwriter were used to fill in the blank checks and then the checks were cashed by other persons with the use of false identification papers acquired by Woodward. The typewriter and checkwriter were then destroyed." *U. S. v. Woodward,* supra at 2.

The indictment on the basis of which defendant was convicted[1] in this court here charges that (Count 2):[2]

"ROBERT ROY WOODWARD, while under oath, did knowingly declare before said court and jury, in substance, that he had no knowledge concerning the acquisition or disposition of false identification, the typewriter from the offices of W and W Trucking and the checkwriter recovered by the Federal Bureau of Investigation from Susan Walker's apartment.

"6. The aforesaid testimony of ROBERT ROY WOODWARD, as he then and there well knew and believed, was false."

Defendant's collateral estoppel claim was raised for the first time on appeal and, accordingly, the Circuit directed that we make the initial determination of such claim. This contention was never brought to the attention of this court during the proceeding here, but is now before us pursuant to the Circuit's mandate.

The doctrine of collateral estoppel applies to criminal cases as part of the constitutional protection against double jeopardy. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The doctrine has its roots in the double jeopardy clause's policy against exposing a defendant to repeated risks of a conviction for the same offenses. In *Ashe v. Swenson,* the Supreme Court stated the reviewing court's approach to the issue as follows:

" 'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary sys-

tem of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Id. at 443, 90 S.Ct. 1189, 1194.

"The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' *Sealfon v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 240 [92 L.Ed. 180]. Any test more technically restrictive would of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal." Id. at 444, 90 S.Ct. at 1194 (footnotes omitted).

We must, therefore, on the basis of the voluminous records in both cases determine whether the first trial necessarily decided that defendant's relevant testimony was true. Simply stated, does collateral estoppel preclude the relitigation of the truthfulness of defendant's testimony?

We hold that it does not because Woodward's acquittal cannot be viewed as turning on the jury's acceptance of his denial of *any knowledge* concerning the acquisition of or disposition of false identification,

---

1. Woodward escaped from federal custody following sentence in the instant case and is presently at large as a fugitive.

2. Count 1 charged subornation of perjury. On this count he was acquitted.

the typewriter and the checkwriter. An acquittal of charges of conspiracy, aiding and abetting, and transporting forged checks in interstate commerce does not mean that all of the elements required to prove such crimes were found to be lacking. The jury did not necessarily determine "that which the defendant seeks to foreclose from consideration," *Ashe v. Swenson*, supra, at 444, 90 S.Ct. at 1194, namely, whether defendant was an unwitting participant in the scheme or at least had knowledge of the scheme.

## FACTS

Defendant, as stated, was indicted on charges of conspiracy, interstate transportation of forged, falsely made and counterfeited checks, and aiding and abetting in violation of Title 18 U.S.C. §§ 371, 2314 and 2. Four of defendant's alleged co-conspirators were called as government witnesses. Gary Laird and Kenneth Krayeski testified that Woodward had given them the forged checks, that they had cashed them at his direction, and delivered the proceeds to him for distribution among the conspirators. Susan Walker, a co-conspirator who knew that Woodward had disposed of the checkwriter, changed her testimony so as not to implicate Woodward. (Compare Tr. 276–289 of the initial trial with Tr. 178–195 of the subsequent perjury trial). David Ball, a co-defendant who had entered a plea of guilty testified that Woodward was not involved in the scheme and shouldered the responsibility himself. (Tr. 187–249). Another co-conspirator, Edward "Peanuts" Nowakowski, who was also a government witness, fled the district and was unavailable to testify. Nowakowski testified at the perjury trial that Woodward procured false identification and disposed of the typewriter and checkwriter. (Tr. 72–82) Woodward's defense at trial was that he had no connection with the scheme. On the stand Woodward categorically denied that he had any knowledge of the details of the scheme; he denied procuring false identification, obtaining and disposing of the checkwriter and typewriter used to forge the checks. (Tr. 440–486) In his closing argument,

Woodward's counsel contended that the government's witnesses were unbelievable and that the government had failed to meet its burden of proof. Woodward was acquitted by general verdict on all counts.

Following the jury verdict of not guilty, Woodward was indicted for violating 18 U.S.C. § 1623 by reason of the false testimony he had given at the trial concerning his knowledge or lack of knowledge of the details of the criminal scheme. At the perjury trial, Nowakowski testified that he had given Woodward one of the sets of false identification used in the scheme, that he and Woodward had delivered the checkwriter to Susan Walker's apartment and that he had then disposed of the typewriter by throwing it into Lake Erie. Nowakowski testified that they had taken the checkwriter and the typewriter from defendant's office (Tr. 71–80).

Susan Walker corroborated Nowakowski's testimony that it was he and Woodward who brought the checkwriter to her apartment and that she had lied at defendant's first trial at Woodward's request. (Tr. 178–194) Jay Nedell, Esq., an attorney who was associated with defendant's original counsel at the first trial, identified a tape recording of a November 5, 1975, pretrial interview with Walker in which she stated that Woodward brought the checkwriter to her apartment. (Tr. 256–271) Defendant again took the stand in his own defense and categorically denied having any knowledge of the details of the scheme. (Tr. 467–558) The substance of his testimony at the two trials was essentially the same. Defendant was found guilty of perjury.

## DISCUSSION

Defendant argues that *Ashe v. Swenson*, supra, bars his conviction. The evidence introduced in the perjury case was essentially the same as the evidence presented on the earlier charges. We are, therefore, "called upon to determine whether the 'same evidence' test or the 'same transaction' test properly defines the scope of the

'same offense' phrase in the double jeopardy clause.[3]  Compare *Ashe v. Swenson,* 397 U.S. 436, 452–60, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring) with *id.,* at 463–64, 90 S.Ct. 1189 (Burger, C. J., dissenting).  See generally the Supreme Court 1976 Term, 91 Harv.L.Rev. 70, 101–14 (1977)."  *U. S. v. Venable,* 585 F.2d 71, 74 n. 3 (3d Cir. 1978).

■  *Ashe,* however, does not prohibit the admission of the *same* evidence at the second trial, but only prohibits the relitigation of the issues conclusively decided in defendant's favor in the first prosecution. Accord, *U. S. v. Fowler,* 463 F.Supp. 649, 651 (W.D.Va.1978); *Smith v. U. S.,* 277 F.Supp. 850 (D.Md.1967), aff'd 401 F.2d 773 (4th Cir. 1968).  Application of collateral estoppel under defendant's reasoning would convert the guarantee of double jeopardy from a shield into a sword by encouraging criminal defendants to lie in any and all cases.

In *Ashe,* the Supreme Court ruled that a defendant could not be tried for the robbery of one of six poker players after having previously been acquitted of the robbery of another of the poker players.  "The single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers.  And the jury by its verdict found that he had not."  397 U.S. at 445, 90 S.Ct. at 1195.  On that basis, the court concluded that the second prosecution was barred.  In this case, defendant argues that that testimony alleged to have been false is on facts which were the very basis of the prior acquittal.  We disagree.

The basis of the perjury charge was testimony given by the defendant during the original trial to the effect that he had no knowledge of the criminal scheme.  The acquittal of the crimes charged in the original indictment was certainly not a determination that defendant had no knowledge of the criminal activities.  See *U. S. v. Wil-*

*liams,* 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1951), where, as here, the "defendant's innocence of the crimes" may be "reconciled with as subsequent finding of falsity," the Fifth Amendment's protection against double jeopardy as incorporated in the doctrine of collateral estoppel does not bar prosecution and conviction for perjury in a situation such as this.  See *Adams v. U. S.,* 287 F.2d 701 (5 Cir. 1961).

We will now turn to the specific perjury allegations, recited in Count II of the indictment,[4] all of which emanated from defendant's trial testimony.  Whatever else the jury may have decided by its general verdict or acquittal, it is clear that it necessarily determined that defendant did not commit the offenses charged in the previous indictment.[5]  To hold otherwise, would distort the plain meaning of defendant's general verdict of acquittal.  The indictment for perjury, however, deals with substantive portions of defendant's testimony which, although important for the jury to consider, were not necessarily passed upon in reaching the verdict of acquittal.  The jury was not required to believe, for example, that defendant had *no knowledge* concerning the acquisition or disposition of false identification, the typewriter from the offices of W & W Trucking and the checkwriter recovered by the FBI from Susan Walker's apartment.  A rational jury could find that defendant had knowledge concerning such matters but that he lacked the requisite intent or that the government failed to prove any other element of the crimes recited in the indictment beyond a reasonable doubt.

The court's charge to the jury in the first trial properly stressed the government's burden of proof, that it always remains the burden of the government to prove its case beyond a reasonable doubt and that it does not become the burden of the defendant to disprove the government's case.  The judge

---

3. The Fifth Amendment's guaranty against double jeopardy provides:

"nor shall any person be subject for the same *offence* to be twice put in jeopardy of life or limb."

4. See Appendix "A".

5. See Appendix "B".

·

(Chief Judge Weber) mentioned other factors for the jury to consider with respect to Count I: whether defendant acted independently in some way to help the conspiracy, whether defendant wilfully participated in the plan with the intent to advance or further some object or purpose of the conspiracy (Tr. 59), whether there was an agreement and whether defendant associated himself with it (Tr. 65). The court charged that it must be shown that defendant neither accidentally nor involuntarily became a member, but knew from the surrounding circumstances what was afoot, and willingly participated in that act (Tr. 67).

The judge properly charged the jury to consider several factors with respect to the aiding and abetting offenses; whether the defendant voluntarily associated himself with the venture and performed some affirmative act in making it succeed. The court charged that "the mere presence at the scene of the crime or knowledge that a crime is being committed is not sufficient to establish that a defendant aided and abetted unless you find that the defendant was a participant in some way and not merely a spectator (Tr. 65), and that defendant wilfully and intentionally participated in the crime of passing the forged securities in interstate commerce. (Tr. 65)

The judge also properly charged that defendant's mere presence at the scene of the crimes or knowledge that such crimes were being committed is insufficient to establish defendant's guilt with respect to such crimes. *Therefore, a verdict of not guilty does not also require a finding that defendant had no knowledge concerning the acquisition or disposition of false identification, the typewriter or the checkwriter.* In this case, several elements were litigated with respect to each offense charged in the indictment and a general verdict of acquittal may indicate that the jury found in favor of the defendant on only one element of each offense. A general verdict, however, does not reveal the identity of that element.

"Rarely, if ever, does a general verdict of not guilty 'necessarily require a determination' on any particular fact, asserted by the defendant." Comments, Model Penal Code, Tent Draft No. 6 (1956), pp. 122–3. We reject the notion that a verdict of acquittal means the jury believed all of a defendant's testimony.

This court carefully delineated the scope of the issues before the court and jury in the second trial. The court charged the jury to determine whether defendant's statements under oath at the previous trial with respect to his lack of knowledge concerning the false identification, the purposes for which it was to be used, the checkwriter and the typewriter were false and knowingly false (Tr. 762). The court explained that such testimony had been determined by the court to be material to the inquiry that was then being conducted before the court (668–669)[6] and cautioned the jury that the prior case was not being re-tried (671).

Although the same or similar evidence was introduced at both of the trials, where, as here, the issues in the perjury trial have not been conclusively decided in defendant's favor in the first prosecution, *Ashe v. Swenson* does not bar the subsequent conviction.

An appropriate order will be entered.

### APPENDIX "A"

### SECOND COUNT

The grand jury further charges:

1. On or about the 8th day of January, 1976, in the Western District of Pennsylvania, the defendant, ROBERT ROY WOODWARD, while under oath as a witness in the criminal case then being tried before the United States District Court for the said district entitled *United States v. Robert Roy Woodward et al.*, Criminal No. 75–308, knowingly did make a false material declaration, that is to say:

2. At the time and place aforesaid, the Court and jury were engaged in the trial of

---

**6.** Materiality is a question of law to be decided by the court, not the jury. *U. S. v. Dipp*, 581 F.2d 1323, 1328 (9th Cir. 1978).

the aforementioned case wherein Robert Roy Woodward was charged in a ten count indictment with conspiracy, interstate transportation of forged, falsely made and counterfeited checks, and aiding and abetting in violation of Title 18 United States Code, Sections 2, 371 and 2314.

3. It was material to said trial to determine:

(a) Whether Robert Roy Woodward had acquired false identification to be used by others in cashing forged, falsely made and counterfeited checks;

(b) Whether Robert Roy Woodward had removed a certain typewriter from the offices of W.W. Trucking Company and caused said typewriter to be destroyed;

(c) Whether Robert Roy Woodward had taken a certain check writer to an apartment belonging to one Susan Walker and placed said check writer in Susan Walker's custody and control.

4. The above mentioned matter was material to said trial because the false identification, the typewriter and the check writer were all instrumentalities used in preparing and cashing the forged, falsely made and counterfeited checks charged in the indictment at Criminal No. 75–308.

5. At the time and place aforesaid, Robert Roy Woodward, while under oath, did knowingly declare before said Court and jury, in substance, that he had no knowledge concerning the acquisition or disposition of false identification, the typewriter from the offices of W and W Trucking and the check writer recovered by the Federal Bureau of Investigation from Susan Walker's apartment.

6. The aforesaid testimony Robert Roy Woodward, as he then and there well knew and believed, was false.

All in violation of Title 18 United States Code, Section 1623.

A true bill,
(s) Burrell E. Hoffacker
Foreman

(s) Blair A. Griffith
BLAIR A. GRIFFITH
United States Attorney

APPENDIX "B"

The grand jury charges:

1. That from on or about the 1st day of March, 1975, and continuing thereafter up to and including the 1st day of May, 1975, in the Western District of Pennsylvania, Robert Roy Woodward, Kenneth Leroy Krayeski, Cynthia J. Northup, David Ball and Gary Edward Laird, named defendants herein, did wilfully and knowingly combine, conspire, confederate and agree together and with each other to commit an offense against the United States of America, that is, with unlawful and fraudulent intent, to transport and cause to be transported in interstate commerce, falsely made, forged, altered and counterfeit securities, knowing the same to have been falsely made, forged, altered and counterfeited, in violation of Section 2314, Title 18, United States Code.

2. It was part of the above conspiracy that Robert Roy Woodward and Kenneth Leroy Krayeski would acquire sixty-three blank checks of the J. Miller Express Company.

3. It was further part of this conspiracy that Robert Roy Woodward, Kenneth Leroy Krayeski and Cynthia J. Northup would falsely make, forge, alter and counterfeit said checks by adding dollar amounts and the names of payors and payees.

4. It was further part of this conspiracy that Robert Roy Woodward would give the aforementioned falsely made checks to David Ball and Gary Edward Laird.

5. It was further part of this conspiracy that David Ball and Gary Edward Laird would take the aforementioned checks to various business establishments in the states of Ohio, Indiana, and West Virginia, where they would negotiate said checks. Further, as a result of said checks being negotiated, they were forwarded to the Pittsburgh National Bank in McKees Rocks, Pennsylvania, for collection in the normal course of business.

6. It was further part of said conspiracy that the money collected during the course

of negotiating said checks was turned over to Robert Roy Woodward for distribution among the various co-conspirators.

## OVERT ACTS

In pursuance of and in order to further the objects, designs, and purposes of the conspiracy, the defendants did do and perform, among others, the following overt acts:

1. In March or early April of 1975, the defendant Robert Roy Woodward did acquire sixty-three blank checks belonging to the J. Miller Express Company.

2. In March or early April of 1975, defendants David Ball and Gary Edward Laird did acquire false drivers licenses and other false identification to be used by them in cashing J. Miller Express Company checks.

3. In March or early April of 1975, the defendant Gary Edward Laird did purchase a check protector machine in the name of Nu-Ru Transfer or Trucking Company.

4. In March or early April of 1975, the defendants Robert Roy Woodward, Kenneth Leroy Krayeski, Cynthia Northup, David Ball and Gary Edward Laird, met in an apartment in Erie, Pennsylvania, where they discussed the conspiracy and filled in the amounts and payor and payee names on approximately forty of the J. Miller Express Company checks.

5. In early April of 1975, defendants David Ball and Gary Edward Laird did travel to Ohio, Indiana and West Virginia and negotiated falsely made and forged J. Miller Express Company checks at numerous business establishments.

6. In April of 1975, defendant Gary Edward Laird turned the money he received from cashing the J. Miller Express Company checks over to defendant Robert Roy Woodward.

All in violation of Title 18 United States Code, Section 371.

### SECOND COUNT *

The grand jury further charges:

On or about the 9th day of April, 1975, the defendants, Robert Roy Woodward, Kenneth Leroy Krayeski, Cynthia J. Northup and David Ball did with unlawful and fraudulent intent, transport and cause to be transported in interstate commerce, to-wit, from the Buckeye Lake Truck Stop in Buckeye Lake, Ohio, to McKees Rocks, Pennsylvania, a falsely made, forged and counterfeited security, to-wit, one J. Miller Express Company check, Number T16248, dated April 9, 1975, signed J.T. Long, payable to the order of Peter T. Farrelly, in the amount of $180.00, and the above defendants then knew said check to have been falsely made, forged and counterfeited.

In violation of Title 18, United States Code, Sections 2314 and 2.

* Counts III through IX charge additional violations of 18 U.S.C. §§ 2314 and 2.